Patrick CAHILL and Julia
Cahill, Plaintiffs,

v.

JOHN DOE–NUMBER ONE also
known as "Proud Citizen," John Doe–
Number Two also known as "Screwed
U All," John Doe–Number Three also
known as "Saw It All," John Doe–
Number Four also known as "Me
Too,", Defendants.

C.A. No. 04C–11–022–JRS.

Superior Court of Delaware.
New Castle County.

Submitted: Feb. 8, 2005.
Decided: June 14, 2005.
Corrected: June 16, 2005.

Robert J. Katzenstein, Esquire, Robert K. Beste, III, Smith, Katzenstein & Furlow, Wilmington, Delaware, Attorneys for Plaintiffs.

David L. Finger, Esquire, Finger & Slanina, P.A., Wilmington, Delaware, Attorney for Defendant, John Doe—Number One.

## MEMORANDUM OPINION

SLIGHTS, J.

### I.

In a case of first impression in Delaware, the Court must balance the First Amendment protection of anonymous speech against the right of a putative victim of defamation to discover the identity of the anonymous speaker. Pending before the Court is a motion for protective order in which Defendant, John Doe No. 1, seeks an order preventing Comcast Cable Communications, Inc. ("Comcast") from disclosing his identity to the Plaintiffs, Patrick Cahill and his wife, Julia (the "Cahills"). According to the Cahills, John Doe No. 1 is an anonymous user of an internet "blog" who, along with Defendants, John

Doe Nos. 2, 3 and 4, posted defamatory statements about the Cahills on the blog.[1] On December 22, 2004, the Court entered an *ex parte* Order requiring Comcast to disclose to the Cahills the identities of John Doe Nos. 1, 2, 3, and 4 so that the Cahills could name them as defendants in this defamation action and properly serve their complaint. As directed by the Court, prior to disclosing the information, Comcast notified each of the John Doe defendants of the Court's Order to enable them to seek appropriate protective relief from the Court.[2] Only John Doe No. 1 has sought such relief.

To resolve this motion, the Court must first identify the applicable standard of review. Specifically, the Court must determine the appropriate burden to place upon a defamation plaintiff who seeks to compel a third party to disclose the identity of an anonymous speaker. Plaintiff's showing of need for the identity of the speaker and of the *bona fides* of his defamation claim must be sufficient to overcome the speaker's First Amendment right to remain anonymous. John Doe No. 1 urges the Court to adopt a standard that would require the Cahills to establish a *prima facie* case for defamation against him before the Court orders Comcast to disclose his identity.[3] Not surprisingly, he contends that the Cahills have not sustained this burden. In response, the Cahills argue that the Court should impose a less burdensome standard that would require them simply to demonstrate that they have a "good faith basis" to contend

1. A blog, short for weblog, is an internet website where users interested in a particular topic can post messages for other users interested in the same topic to read and answer if they wish. When users post information on a blog, they often do so using a pseudonym referred to as a "user name."

2. *See* 47 U.S.C. § 551(c)(2)(B)("A cable operator may disclose such information ... pursu-

ant to a court order authorizing such disclosure if the subscriber is notified of such order by the person to whom the order is directed....").

3. The Court will refer to "John Doe No. 1" in the masculine sense. It is, of course, unknown at this time whether John Doe No. 1 is male or female.

that they have been the victims of defamation. Not surprisingly, the Cahills contend that they have met this burden.

For the reasons that follow, the Court finds that the standard proffered by the Cahills is the more appropriate standard under the circumstances presented here because it allows for a more accurate weighing of the First Amendment right of the anonymous speaker against the right of a defamation plaintiff to seek redress for reputational injury. Additionally, the Court is satisfied that the Cahills have met their burden in this case in that they have demonstrated a good faith basis to contend that they have been the victims of defamation at the hands (literally by keystroke) of John Doe No. 1. Accordingly, the Cahills' subpoena directed to Comcast is appropriate and the motion for protective order is **DENIED.**

## II.

Plaintiff, Patrick Cahill, serves as a member of the Smyrna Town Council. This is an elected position for which Mr. Cahill must campaign for votes. Apparently, at some point in 2004 (or before), Councilman Cahill began to disagree publicly with the policies of Smyrna's Mayor, Mark Schaeffer.[4] A personal dispute between the Cahills and Mayor Schaeffer also became the subject of public discussion.[5] This background is important to place the blog statements at issue in context.

Independent Newspapers, Inc. is the host of the "Smyrna/Clayton Issues Blog," an internet bulletin board that invites on-line discussion of issues facing the Smyrna/Clayton area, including political issues.[6]

In September of 2004, John Doe Nos. 1 through 4 posted messages on this blog under the pseudonyms "Proud Citizen," "Screwed U All," "Saw It All," and "Me too," respectively. Specifically, on September 18, 2004, John Doe No. 1 posted the following message:

> If only Councilman Cahill was able to display the same leadership skills, energy and enthusiasm toward the revitalization and growth of the fine town of Smyrna as Mayor Schaeffer has demonstrated! While Mayor Schaeffer has made great strides toward improving the livelihood of Smyrna's citizens, Cahill has devoted all of his energy to being a divisive impediment to any kind of cooperative movement. **Anyone who has spent any amount of time with Cahill would be keenly aware of such character flaws, not to mention an obvious mental deterioration.** Cahill is a prime example of failed leadership—his eventual ousting is exactly what Smyrna needs in order to move forward and establish a community that is able to thrive on economic stability and common pride in its town.[7]

On the following day, John Doe No. 1 posted another message. It read:

> **Gahill** is as **paranoid** as everyone in town thinks he is. The mayor needs support from his citizens and protections from unfounded attacks.... [8]

In addition to John Doe No. 1's postings, John Doe Nos. 2, 3, and 4 also weighed in on the Cahill/Schaeffer dispute. On October 1, 2004, John Doe No. 2 wrote:

> I have to say that I would be embarrassed to be associated with the scum of

4. *See* D.I. 1, at ¶¶ 7–12.

5. *See id.*

6. The blog is located at http://newsbl og. info/0405. It is owned and operated by Independent Newspapers, Inc., and connected

with Independent Newspapers, Inc.'s publication, the Delaware State News.

7. D.I. 1, at ¶ 7 (emphasis supplied).

8. *Id.* (emphasis supplied).

the earth Pat and Julia [Cahill]. Everybody in town talks about how freaky they are. Not to mention the fact that Julia has screwed ... or at least tried to screw half the people in town! That just goes to show that she's nothing but a "bottom of the barrel scum sucking whore"!! While I am thinking about it, why don't Pat and Julia take their boat and shove it up their asses ... I hear Pat likes that kind of stuff. Isn't that right Doug? ? ? ? ? ?

I hope Mayor Schafer [sic] installs 50 cameras ... he'll need them to keep himself and his family safe from the crazy ass freaks like you and the Cahills! Oh yeah, please tell me that it was a joke in the "S[tate] News" about the Schafers [sic] wanting to look at Cahill's wife ... WHO IN THE HELL WOULD WANT TO LOOK AT THAT FAT PIECE OF SHIT? Come on, I'd have a better chance of getting aroused watching [a government official].

Keep guessing Cahill!! You could never figure it out if you tried!! I love making you look like an even bigger ass than people believe you are. As for the intelligence of your wife ..., she married you that speaks for itself!! It's fun how distorted your perception of reality is, but then again you are Pat the Rat Cahill! Oh yeah, it's obvious "sparks" is your fat ass wife!!! Speaking of which, do you know where your wife is? She better be careful because the police are really cracking down on prostitutes!! [9]

On the following day, John Doe No. 2 posted another message. It read:

Ha Ha Pat Cahill!! Guess again! The fact that you think I am one of the Schafers [sic] makes it obvious that you really don't have a clue ... if that weren't already obvious enough! The fact is the truth hurts and it's about time you came to grips with reality and face the fact that not only I, but everyone else is Smyrna knows what a low life you and your wife are. I LOVE the fact that this has irritated you so much. That's obvious, due to the fact you actually spend time trying to rationalize how your wife might be as "respectable" as you would like her to be! I hope you don't lose any more sleep. [10]

John Doe Nos. 3 and 4 followed by posting these messages:

John Doe No. 3:

Yeah! You're right about Cahill's wife. Word is she left him ... couldn't have sex because he has Hepititis [sic] C. Now she's living in Dover with her BIG blond girlfriend and they both go out to the bars most nights trying to pick up guys. I saw her the [sic] out the other night trying to pick up some guys. The guy was so drink [sic] he didn't even know how ... looking she was and they left together. [11]

John Doe No. 4:

I saw Pat Cahill in the liquor store at Spruance City buying his nightly bottle so he could get soused. Guess he has nothing else to do since his wife left him. Guess no one wants to be associated with him. I didn't know he was ill tho [sic] I wondered why he wouldn't join the ambulance service when we asked him since he was SUPPOSED to be a paramedic. WOW! I wouldn't want to be in Town Hall with him. Isn't heititis [sic] C deadly? [12]

Citing these blog postings, the Cahills filed a complaint in this Court against John Does Nos. 1, 2, 3 and 4 alleging, *inter*

9. *Id.* at ¶ 9.

10. *Id.* at ¶ 12.

11. *Id.* at ¶ 10.

12. *Id.* at ¶ 11.

*alia,* defamation.[13] Since each of the postings were made under pseudonyms, the Cahills were unable to determine the true identity of the speakers. This left them without defendants upon whom to serve their complaint.

Through counsel, the Cahills discovered that Independent Newspapers, Inc. kept track of the internet protocol addresses ("IP address") of everyone who posted messages on the blog. IP addresses are owned by internet service providers ("ISP") who then assign the IP addresses to subscribers when they go "online." The IP addresses are assigned to only one subscriber at a time.[14] Therefore, if the ISP knows the time and date of the postings made from a specific IP address, it can then determine the identity of the subscriber.

Pursuant to Delaware Superior Court Civil Rule 30, the Cahills requested leave of Court to conduct depositions of Independent Newspapers, Inc. prior to service of process in order to determine the IP addresses of the anonymous defendants.[15] The motion was granted on November 23, 2004.[16] Through these depositions, the Cahills discovered that the IP addresses they were looking for all belonged to Comcast, an ISP. Armed with the IP addresses of John Doe Nos. 1 through 4, the Cahills served subpoenas *duces tecum* upon Comcast seeking documents that would reflect the identify of each of the John Doe defendants. Pursuant to 47 U.S.C. § 551(c)(2)(B), Comcast notified John Doe Nos. 1 through 4 of the subpoenas prior to making any response to the Cahills. John Doe No. 1 has now filed a motion for protective order to prevent Comcast from releasing his identity to the Cahills.

The Court heard oral argument on January 7, 2005. At the conclusion of the hearing, the Court requested supplemental briefing. Having received the parties' supplemental briefing, the matter is ripe for decision.

### III.

John Doe No. 1 contends that an order compelling Comcast to release his identity to the Cahills would violate his First Amendment right to anonymous speech. He argues that before the Court strips him of his First Amendment protection, it should first require the Cahills to meet the burden articulated in *Dendrite International, Inc. v. Doe.*[17] In *Dendrite,* the court required the plaintiff to make a *prima facie* showing of defamation before it would compel an ISP to identify an anonymous user of an internet blog. Because the Cahills have not met this burden, John Doe No. 1 argues that his First Amendment right to anonymity must be protected and the subpoenas to Comcast must be quashed.

The Cahills urge the Court to reject the *Dendrite* standard in favor of a more le-

---

**13.** *See* D.I. 1. As stated, the Cahills also have named John Doe Nos. 2 through 4 in this suit alleging defamation in connection with the postings they made on the blog. John Doe Nos. 2 through 4, however, have not challenged the subpoena to Comcast or otherwise formally appeared in this litigation.

**14.** *Sony Music Entertainment, Inc. v. Does 1–40,* 326 F.Supp.2d 556, 558–59 (S.D.N.Y. 2004).

**15.** D.I. 2. *See* Del. Super. Ct. Civ. R. 30(a) (2005)(*"When depositions may be taken.* After commencement of the action, any party may take the testimony of any person, including a party, by deposition upon oral examination. Leave of court, granted with or without notice, must be obtained only if the plaintiff seeks to take a deposition prior to the expiration of 30 days after service of the summons and complaint upon any defendant....").

**16.** D.I. 2.

**17.** 342 N.J.Super. 134, 775 A.2d 756 (App. Div.2000).

nient standard that would allow them access to John Doe No. 1's identity upon a "good faith" showing of defamation.[18] The Cahills contend that forcing them to establish a *prima facie* case of defamation at this very early stage of the litigation requires too much and would be inconsistent with Delaware's long-standing recognition of the right of her citizens to seek redress in the courts for damage to reputation. Finally, the Cahills argue that they have made a "good faith" showing of defamation against John Doe No. 1 and that his identity, therefore, should be disclosed so that they can serve their complaint and move forward with this litigation.

The parties' contentions present two issues for the Court to decide: (1) what is the appropriate standard by which the Court should determine whether to allow disclosure of an anonymous internet user's identity when the user is sued for making defamatory statements over the internet; and (2) whether the Cahills have met that standard.

### IV.

### A. Setting The Appropriate Standard

Before establishing a legal standard by which the entitlement to a remedy will be measured, it is helpful first to identify specifically the interests that are meant to be advanced or protected by that standard. In this case, the competing interests at work are the First Amendment right to engage in anonymous speech and the common law right to be protected from vexatious, defamatory speech. The Court will consider these interests *seriatim* before addressing the appropriate standard of review pursuant to which a motion such as this should be considered.

### 1. The First Amendment Right to Anonymous Speech

■ The right of a public speaker to maintain his anonymity is firmly rooted in the First Amendment.[19] In *Talley*, the United States Supreme Court struck down a California statute that required the name of the author and printer of a political pamphlet to be displayed on the cover. The Court pointed out that "[p]amphlets and leaflet [sic] ... 'have been historic weapons in the defense of liberty.' "[20] Indeed, anonymous speech has played a vital and well-documented role in the nation's history.[21] Our nation's earliest and most influential works were anonymous.[22] This

**18.** *Accord In re Subpoena Duces Tecum to America Online, Inc.,* 2000 WL 1210372 (Va. Cir. Ct.2000), *rev'd on other grounds,* 261 Va. 350, 542 S.E.2d 377 (2001)(adopting the "good faith showing" standard). In their supplemental briefing, the Cahills also argue that they should be permitted to discover the identity of John Doe No. 1 because the Court has jurisdiction over him and because John Doe No. 1 has waived his anonymity by appearing in this action. Given the Court's holding on the merits, the Court does not reach this procedural/jurisdictional issue.

**19.** *See Talley v. California,* 362 U.S. 60, 62, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); *Buckley v. American Const. Law Found, Inc.,* 525 U.S. 182, 197–99, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). *See also McIntyre v. Ohio Elections*

*Commission,* 514 U.S. 334, 342, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)("Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of the publication, is an aspect of the freedom of speech protected by the First Amendment.").

**20.** *Talley,* 362 U.S. at 62, 80 S.Ct. 536 (citing *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938)).

**21.** *Talley,* 362 U.S. at 64–65, 80 S.Ct. 536.

**22.** *John Doe v. 2TheMart.com,* 140 F.Supp.2d 1088, 1092 (W.D.Wash.2001) (The Federalist Papers were written under the name of "Publius").

tradition continues as some of the most vigorous and constructive contemporary political discourse is conducted anonymously.[23] Without a right to remain anonymous, the purpose of the First Amendment would be frustrated, as the fear of retaliation at the hands of those who may disagree with a speaker might dissuade him from speaking out in the first place.[24]

### 2. Anonymous Speech and The Internet

■ The right to anonymous speech has been extended to the internet.[25] This extension is appropriate given that the internet readily "facilitates the rich, diverse, and far ranging exchange of ideas."[26] While the reasons justifying the protection of anonymous speech over the internet really are no different than those justifying the protection of such speech in other contexts, anonymity on the internet does pose unique problems and concerns. In particular, information often is disseminated over the internet without any editorial filter.[27] Consequently, anonymous internet speech provides even less accountability than exists with anonymous speech published in other media. As one commentator has observed, the internet provides "not just the ability to put on a mask; it also [provides] the ability to hide absolutely who one is." [28]

### 3. The First Amendment Does Not Protect Defamatory Speech

■ As stated, the right to anonymous speech is a well-recognized component of the First Amendment; courts will protect anonymous speech with the same vigor demonstrated in the protection of free speech generally.[29] Courts have recognized, however, that the right to anonymous speech, like the right to free speech generally, is not absolute.[30] Thus, for instance, the First Amendment will not protect individuals who use anonymous speech to defame others.[31] In this regard, Justice Murphy, writing for an unanimous Court, explained:

> Allowing the broadest scope to the language and purpose of the Fourteenth

23. *See e.g. McIntyre,* 514 U.S. at 347, 115 S.Ct. 1511 (1995)("Indeed, the speech in which Mrs. McIntyre [anonymously] engaged—handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression.").

24. *Id.*

25. *Reno v. ACLU,* 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)("[The Court] agrees with [the District Court's] conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the internet].").

26. *2TheMart.com,* 140 F.Supp.2d at 1092.

27. Jennifer O'Brien, Note, *Putting a Face to a (Screen) Name: The First Amendment Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet Speakers in Online Defamation Cases,* 70 Fordham L.Rev. 2745, 2765 (2002).

28. *Id.* at 2758.

29. *See 2TheMart.com,* 140 F.Supp.2d at 1092 ("A component of the First Amendment is the right to speak with anonymity. This component is well established."); *McIntyre,* 514 U.S. at 342, 115 S.Ct. 1511 ("[A]n author's decision to remain anonymous ... is an aspect of the freedom of speech protected by the First Amendment."); *Talley,* 362 U.S. at 65, 80 S.Ct. 536 ("[I]dentification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance.").

30. *Sony,* 326 F.Supp.2d at 562–63; *2TheMart.com,* 140 F.Supp.2d at 1092.

31. *See 2TheMart.com,* 140 F.Supp.2d at 1093. *See also America Online,* 2000 WL 1210372, at *6 ("Those who suffer damages as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights.").

951

Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution. . . .' [32]

While the internet offers an accessible and vital forum for free speech, by its nature, it also presents the real danger that users might abuse the medium by rapidly spreading defamatory information through "cyber space" to every desk top computer terminal with internet access throughout the world. This potential for widely-circulated, quickly-disseminated

harmful speech over the internet, combined with the difficulty of identifying the source of the speech, can leave the victim of defamatory speech in the untenable situation of sitting idly by, without any recourse, as his reputation quite literally is destroyed. Even though legitimate competing interests are on the line, there must be a point when a speaker's First Amendment right to anonymous speech will yield to the right of the target of his speech to protect his reputation. The Court's task in this regard is to identify a standard by which these competing interests can be balanced and protected.[33]

### 4. The *Dendrite* Standard

In *Dendrite*, a public corporation brought a defamation action against numerous John Doe defendants for messages posted on an internet bulletin board.[34] Three of the posted statements were messages accusing Dendrite and its president of altering accounting methods to overstate revenue.[35] A fourth statement accused the president of secretly shopping the company for sale because it was no longer competitive.[36] After filing its complaint, Dendrite sought an order to show cause why it should not be granted leave to conduct limited discovery for the purpose of ascertaining all of the John Does' identities.

**32.** *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**33.** *See America Online,* 2000 WL 1210372, at *2 ("The protection of the right to communicate anonymously must be balanced against the need to assure that those persons who choose to abuse . . . this medium can be made to answer for such transgressions."); *Dendrite,* 775 A.2d at 760 ("The . . . court must . . . decide . . . by striking a balance between the well-established First Amendment right to speak anonymously, and the right . . . to protect . . . proprietary interest and reputation . . ."); *Sony* 326 F.Supp.2d at 563 ("Against the backdrop of First Amendment protection

for anonymous speech, courts have held that civil subpoenas seeking information regarding anonymous individuals raise First Amendment concerns."); *Columbia Ins. Co. v. Seescandy.com,* 185 F.R.D. 573, 578 (N.D.Cal. 1999)("[T]he traditional reluctance for permitting filings against John Doe defendants . . . should be tempered by the need to provide injured parties with an [sic] forum in which they may seek redress for grievances.").

**34.** *Dendrite,* 775 A.2d at 760–61.

**35.** *Id.*

**36.** *Id.* at 763.

The New Jersey Superior Court denied the limited discovery request.[37] In doing so, the court adopted a standard, first articulated in *Seescandy.com*,[38] that requires a defamation plaintiff seeking the identity of anonymous internet subscribers to: (1) demonstrate that they have undertaken efforts to notify the anonymous posters that they are the subject of a subpoena; (2) identify to the court the statements made by each anonymous poster; and (3) establish a *prima facie* cause of action for defamation against the anonymous posters by producing evidence sufficient to support each element of the claim.[39] If the plaintiff is able to present a *prima facie* case for defamation, then the court must "balance the defendant's First Amendment right of anonymous speech against the strength of the *prima facie* case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed."[40] The balancing does not occur unless and until the *prima facie* case has been established.

The practical effect of the *Dendrite* standard is that the plaintiff must answer what is tantamount to a motion to dismiss before the plaintiff can learn the identity of the speaker he claims has defamed him. *Dendrite* characterizes this burden as a requirement that the plaintiff demonstrate "probable cause" that defamation has oc-

curred.[41] According to *Dendrite*, setting this high threshold of proof for the plaintiff is necessary to prevent the abuse of liberal discovery rules.[42]

Relying upon the *Dendrite* standard, John Doe No. 1 contends that the Cahills cannot demonstrate a *prima facie* case of defamation. The two statements attributed to John Doe No. 1, considered in a light most favorable to the Cahills, accuse Mr. Cahill of being mentally ill and/or gay.[43] According to John Doe No. 1, neither statement is *per se* defamatory.[44] Rather, if anything, both statements are nothing more than "rhetorical hyperbole."[45]

The concern that animates the *Dendrite* standard, at first glance, makes perfect sense: if subpoenas can be obtained merely by filing suit, people will be reluctant to speak their mind knowing that their anonymity is tenuous and that retribution for whatever they might say is all the more likely. This is hardly a frivolous consideration. Nevertheless, the *Dendrite* standard goes further than is necessary to protect the anonymous speaker and, by doing so, unfairly limits access to the civil justice system as a means to redress the harm to reputation caused by defamatory speech. Specifically, under *Dendrite*, the plaintiff is put to the nearly impossible

37. *Id.* at 760.

38. *Seescandy.com*, 185 F.R.D. at 578–80.

39. *Id.*

40. *Dendrite*, 775 A.2d at 760–61.

41. *Id.* at 770, *quoting Seescandy.com*, 185 F.R.D. at 580 ("The District Court added that by equating this prong to the probable cause requirement for warrants, 'Plaintiff *must make some showing* that an act giving rise to civil liability actually occurred and that the discovery is aimed at revealing specific identifying features of the person or entity who committed the act.' ").

42. *Dendrite*, 775 A.2d at 770–71 (finding that this test was a "flexible, non-technical, fact sensitive mechanism for courts to use as a means of ensuring that plaintiffs do not use discovery procedures to ascertain identities of unknown defendants in order to harass, intimidate or silence critics in the public forum opportunities presented by the Internet.").

43. The postings refer to Cahill's "obvious mental deterioration," refer to him as "**Ga-hill**" (emphasis supplied), and call him "paranoid." D.I. 1, at ¶¶ 7, 8.

44. *See* D.I. 24, 12.

45. D.I. 12, at 3.

task of demonstrating as a matter of law that a publication is defamatory before he serves his complaint or even knows the identity of the defendant(s). Indeed, under *Dendrite*, the plaintiff is not even able to place the alleged defamation in context by describing the relationship between the plaintiff and the speaker because the speaker's identity is protected until the *prima facie* case against him has been established.

### 5. The *America Online* Standard

■ *In re Subpoena Duces Tecum to America Online, Inc.* ("*America Online*")[46] involved a lawsuit against five John Doe defendants alleging defamation and other breaches of fiduciary duty after the defendants allegedly revealed false, confidential information regarding a publicly traded company in an internet chat room. The plaintiff corporation sought to compel America Online (by subpoena) to determine the identities of the anonymous posters and to disclose the identities to the plaintiff. While the court recognized the importance of protecting an internet user's right to anonymous speech, the court noted that "[t]hrough the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox." [47] Based on this and other concerns, the court expressly declined to follow *Dendrite* and, instead, chose a less burdensome standard by which to consider a plaintiff's request to discover the identity of anonymous defendants in the defamation context. The *America Online* standard requires the plaintiff to satisfy the court that he has a "good faith basis to contend that [he] may be the victim of [actionable] conduct," and that the identity information being sought is "centrally needed to advance that claim." [48]

■ The Court finds that the standard adopted in *America Online* is the more balanced and appropriate standard by which to address the competing interests presented in cases such as this. Even though the *America Online* standard clearly is less onerous than its counterpart, the "good faith" showing required by *America Online* is not insubstantial and more than adequately protects against the abuse of the subpoena power by an overzealous defamation plaintiff.[49] Any "limited intrusion" on the First Amendment

46. *In re Subpoena Duces Tecum to America Online, Inc.*, 2000 WL 1210372 (Va. Cir. Ct.2000), *rev'd on other grounds*, 261 Va. 350, 542 S.E.2d 377 (2001).

47. *Id.* at *5.

48. *Id.* at *8. *America Online* does not define what is needed to establish a "good faith basis" to allege defamation. Accordingly, the Court has looked elsewhere for guidance in making a meaningful distinction between the "good faith basis" and *"prima facie* case" standards at issue here. Specifically, the Court has likened *America Online's* "good faith basis" standard to the standard set forth in Delaware Superior Court Civil Rule 11. *See* DEL.SUPER. CT. CIV. R. 11 (2005); *Ford v. Bank of Delaware*, 1992 WL 423830, at *2 (Del.Super.)("In Delaware, the standard for determining when conduct has violated Rule 11 is a subjective good faith test."). This clearly is a lower threshold than that established by Delaware Superior Court Civil Rule 12, which requires the plaintiff to plead facts sufficient to establish a *prima facie* basis for relief. *See* DEL.SUPER. CT. CIV. R. 12 (2005). Rule 12, therefore, is more reflective of the standard contemplated by *Dendrite*.

49. *See 2TheMart.com*, 140 F.Supp.2d at 1095 (adopting a "good faith" standard upon concluding that the standard provided the anonymous speaker with adequate safeguards to protect the speaker's anonymity against abusive subpoenas). To state the Court's holding in more familiar parlance, the Court finds that a plaintiff must make a Rule 11 showing of defamation, but need not make a showing sufficient to overcome a Rule 12 motion, in order to justify the compelled production of the defamation defendant's identity from a third party.

rights of innocent, anonymous internet posters that may be occasioned by the Court's adoption of the "good faith" standard is substantially outweighed by the need to protect Delaware citizens from the "potentially severe consequences" of defamatory internet communications.[50]

## B. The Cahills' Defamation Claim

■ Under the "good faith" standard that has now been adopted by the Court, in order for the Cahills to discover the identity of John Doe No. 1, they must demonstrate: (i) that they have a legitimate, good faith basis upon which to bring the underlying claim; (ii) that the identifying information sought (John Doe No. 1's identity) is directly and materially related to their claim; and (iii) that the information cannot be obtained from any other source.

## 1. Good Faith Basis

■ In determining whether the defamation claim has been brought in good faith, the Court's review necessarily is confined to the complaint and the papers filed in connection with the plaintiff's request for a subpoena (including the briefs that have been filed in connection with the motion for protective order).[51] As indicated previously, this case is in its infancy; there literally is no other information available in the record for review beyond the initial pleadings and motion papers.

■ John Doe No. 1 argues that the Cahills' defamation claim fails because referring to someone as mentally ill or as a homosexual is not *per se* defamatory. While this argument may have found more traction under the *Dendrite* standard, it stumbles when considered against the less burdensome *America Online* "good faith" standard. To make a "good faith" claim of defamation, the Cahills need not establish *per se* defamation. Rather, it is enough to meet the "good faith" standard that the Cahills articulate a legitimate basis for claiming defamation in the context of their particular circumstances.[52] Given that Mr.

---

**50.** *America Online*, 2000 WL 1210372, at *8. ("[T]his Court finds that the compelling state interest in protecting [the defendant] from the potentially severe consequences that could easily flow from actionable communications on the information superhighway significantly outweigh the limited intrusion on the First Amendment of any innocent subscribers.").

**51.** *See Alvis Coatings Inc. v. John Does 1–10*, 2004 WL 2904405, at *2 (W.D.N.C.2004)(finding that the subpoena was sought in good faith because there was no dispute that the defendant was the author of the information and that the plaintiff had "credibly averred that the statements are both false and damaging to the plaintiff's trademark and to its business generally."). *See also 2The-Mart.com*, 140 F.Supp.2d at 1095–96(stating that "[t]he subpoena would have required the disclosure of e-mails and other personal information that has [sic] no relevance to the issues raised ... while not demonstrating bad faith *per se*, [it] weighs against [the plaintiff] in balancing the interests.").

**52.** *See America Online*, 2000 WL 1210372, at *7 ("[T]he Court agrees ... that [the plaintiff] must establish that there is a legitimate basis to believe that [he] may have *bona fide* claims against John Does before compliance with the *subpoena duces tecum* is ordered...."). "The law of defamation attempts to protect a person's interest in their reputation—the interest in acquiring, retaining and enjoying a reputation as good as one's character and conduct warrant." 2 FOWLER V. HARPER ET AL., THE LAW OF TORTS § 5.1 (2d ed.1986). Under Delaware law, "a communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Q–Tone Broadcasting, Co. v. Musicradio of Maryland, Inc.*, 1994 WL 555391, at *4 (Del.Super.) (citations omitted). To prove defamation, a plaintiff must demonstrate: "(i) a false and defamatory statement; (ii) an unprivileged publication to a third party; (iii) fault amounting to negligence on the part of the publisher; and (iv) actionability of the statement irrespective of special harm or the existence of special harm caused by the

Cahill is a married man, John Doe No. 1's statement referring to Mr. Cahill as "Gahill" might reasonably be interpreted as indicating that Mr. Cahill has engaged in an extra-marital same-sex affair.[53] Such a statement may form the basis of an actionable defamation claim.[54]

Additionally, the Court finds that the Cahills have articulated a good faith basis for a defamation claim with respect to John Doe No. 1's statements concerning Mr. Cahill's mental state. Again, the context in which the statements were made is probative. John Doe No. 1's statements might give the reader the impression that John Doe No. 1 has personal knowledge that Mr. Cahill's mental condition is deteriorating and that he is becoming "paranoid." Given that Mr. Cahill is a member of the Smyrna Town Council, an elected position of public trust, the impression that he is suffering from diminished mental capacity might be deemed capable of causing harm to his reputation, particularly when disseminated over the internet for all of his constituents to read.

### 2. The Identifying Information is Directly and Materially Related to The Cahill's Claim

■ Next, the Cahills must show that the identifying information they seek by subpoena is essential to their claim. Stated differently, the identifying information sought by the subpoena must relate directly and materially to an essential aspect of the claim.[55] "If the information relates only to a secondary claim or to one of numerous affirmative defenses, then the primary substance of the case can go forward without disturbing the First Amendment rights of the anonymous Internet users."[56] In this case, the Cahills easily satisfy this prong of the analysis. The identity of John Doe No. 1 is essential to their defamation claim because without his identity, they are unable to effect service of their complaint upon John Doe No. 1 and commence the litigation.[57]

### 3. John Doe No. 1's Identity Cannot Be Obtained From Another Source

■ Finally, the Cahill's subpoena seeking the identity of John Doe No. 1 will be enforced only if they are able to demonstrate that they cannot discover the identity of John Doe No. 1 by other means. In an internet case, it is clear that the ISP can readily provide the identity of its subscriber(s). But this does not mean in all instances that it should be compelled to do so. The plaintiff must first attempt to locate the identifying information from other sources or demonstrate that it would be futile to undertake this effort. In this case, the Court has permitted the Cahills to discover whether John Doe No. 1 may

---

publication." RESTATEMENT (SECOND) OF TORTS § 558 (1977).

53. *See Q-Tone,* 1994 WL 555391, at *5 ("The [reader's] reasonable interpretation of the statement will be based, in part, on the context in which the [author] made the statement.").

54. *Id.* at *6 ("[T]he Court recognizes that not all accusations of homosexuality are non-defamatory automatically, since there are instances when such an accusation may be made in a harmful context as an assertion of fact intended to cause harm.").

55. *See, e.g., 2TheMart.com,* 140 F.Supp.2d at 1096(finding that the plaintiff failed this prong because the plaintiff sought the subpoena in order to use the information as evidence to support only one of twenty-seven affirmative defenses in an underlying derivative action).

56. *Id.*

57. *See America Online,* 2000 WL 1210372, at *8 ("[T]he subpoenaed identity information is centrally needed to advance that claim."); *2TheMart.com,* 140 F.Supp.2d at 1094 (same).

have voluntarily disclosed his identity to any third party.[58] If he had done so, the Court was satisfied that he would have waived his right to remain anonymous. Otherwise, based on John Doe No. 1's assertion of his First Amendment right to anonymous speech, the Court precluded the Cahills from compelling any third parties to disclose the identity of John Doe No. 1, during depositions or otherwise, pending the outcome of this motion.[59]

To the Court's knowledge, despite months of trying, the Cahills still have not discovered the identity of John Doe No. 1. Accordingly, the Court is satisfied that it is now appropriate to compel third parties, including Comcast, to disclose this information to the extent it is known.

## V.

The right of internet "speakers" to remain anonymous is essential if the internet is to remain a place where people will feel free to exchange information, ideas, and opinions. There is, however, a distinction between using the internet to exchange ideas and opinions and using it as a cover to defame others. Under certain circumstances, when a plaintiff can, in good faith, allege that a user has put the internet to use as a tool for defamation, the internet user will forfeit his right to anonymity in favor of the injured party's right to seek redress for the damage caused by the defamatory speech. Such is the case here. Consequently, John Doe No. 1's motion for protective order must be **DENIED.** Comcast shall supply forthwith all information sought in the subpoena pertaining to the identity of John Doe No. 1. **IT IS SO ORDERED.**

**58.** *See* D.I. 28, 33.

**59.** *See Id.*