COURT OF CHANCERY
OF THE
STATE OF DELAWARE

KATHALEEN ST. JUDE MCCORMICK
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 5, 2022

Ashley R. Altshuler, Esquire
Ethan H. Townsend, Esquire
Kevin M. Regan, Esquire
McDermott Will & Emery LLP
1007 N. Orange Street, 10th Floor
Wilmington, DE 19801

Jason C. Jowers, Esquire
Sarah T. Andrade, Esquire
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801

Julia B. Klein, Esquire
Klein LLC
225 W. 14th Street, Suite 100
Wilmington, DE 19801

Matthew F. Davis, Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, DE 19801

Re:    *BDO USA, LLP v. EverGlade Global, Inc.*,
       C.A. No. 2021-0244-KSJM

Dear Counsel:

On November 4, 2021, I heard oral argument on Plaintiff's Motion for Court Authorization for Twitter, Inc. to Comply with Subpoenas (the "Motion").[1] I granted the motion in a bench ruling during the hearing but indicated that I intended to elaborate upon my ruling at a later time.[2] Hence this letter.

As background, Plaintiff BDO USA, LLP ("Plaintiff" or "BDO") served two subpoenas on Twitter, Inc. ("Twitter") seeking identifying information associated with four

---

[1] *See generally* C.A. No. 2021-0244-KSJM, Docket ("Dkt.") 210 ("Oral Arg. Tr.").

[2] *See id.* at 36:7–14.

anonymous Twitter accounts relevant to this case.[3] Those accounts were @boycottbdo, @boycottbdo1, @boycottbdo2, and @bdoboycott (collectively, the "Twitter Accounts").[4] Plaintiff alleges that those accounts are or were operated by Defendant EverGlade Global, Inc. ("Defendant" or "EverGlade") and EverGlade's CEO Eric Jia-Sobota, a former BDO partner.[5] Plaintiff further alleges that the accounts were used to launch a "smear campaign" against BDO.[6] EverGlade and Jia-Sobota deny association with the accounts.[7] Twitter objected to providing the requested information absent a court order,[8] so Plaintiff filed the Motion.[9]

While the scope of permissible discovery is broad under Delaware law,[10] subpoenas intended to reveal anonymous internet speakers implicate countervailing First Amendment issues.[11] Taking these constitutional issues into account, the Delaware Supreme Court

---

[3] *See* Dkt. 157, Transmittal Decl. of Sarah T. Andrade, Esq. in Supp. of Pl.'s Mot. for Ct. Authorization for Twitter, Inc. to Comply with Subpoenas ("Andrade Decl.") Ex. 8, 9.

[4] *Id.*

[5] Dkt. 156, Pl.'s Mot. for Ct. Authorization for Twitter, Inc. to Comply with Subpoenas ("Mot.") at 2–3.

[6] *Id.* at 3–4.

[7] *See* Dkt. 48, Answer to Am. Verified Compl. ¶¶ 33, 159, 160, 163; Andrade Decl. Ex. 6 at 14:20–25, 163:7–10.

[8] *See* Andrade Decl. Ex. 10, Ex. 11; Mot. at 7 n.3.

[9] *See generally* Mot.

[10] *See, e.g.*, *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 802 (Del. Ch. 2004).

[11] *See generally Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 870 (1997) (holding that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to [the internet]."); *Doe v. 2TheMart.com Inc.*, 140 F.Supp.2d. 1088, 1097 (W.D.

articulated the standard that Delaware courts apply when faced with a discovery request seeking to expose the identity of an anonymous figure who has posted allegedly defamatory material on the internet in the 2005 decision *Doe v. Cahill*.[12]

In *Cahill*, someone anonymously posted statements on an internet blog that accused a Smyrna city councilman of character flaws, mental deterioration, and paranoia.[13] Councilman Cahill and his wife sued the anonymous poster and others for defamation. The plaintiffs served a subpoena on Comcast seeking the identity of the poster through the poster's IP address.[14] The trial court denied a motion for a protective order, applying a "good faith" standard to determine whether the plaintiffs could compel Comcast to disclose the poster's identity.[15]

The Delaware Supreme Court reversed on appeal, announcing the standard that governs the instant analysis.[16] A party seeking to uncover an anonymous speaker's identity through the discovery process must (i) make reasonable efforts to notify the speaker and allow the speaker an opportunity to respond, and (ii) introduce facts sufficient to create a

---

Wash. 2001) (concluding that "the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded.").

[12] *See Doe v. Cahill*, 884 A.2d 451, 461 (Del. 2005).

[13] *Id.* at 454.

[14] *Id.* at 455.

[15] *See Cahill v. John Doe-Number One*, 879 A.2d 943, 954–56 (Del. Super. Ct. 2005).

[16] *Cahill*, 884 A.2d at 466–68.

genuine issue of material fact that would defeat a motion for summary judgment.[17] As I previously ruled, Plaintiff has met both of those burdens.

First, *Cahill* requires that "to the extent reasonably practicable under the circumstances, the plaintiff must undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for order of disclosure."[18] Twitter notified the two accounts identified in the first subpoena, @boycottbdo and @boycottbdo1, by sending notice and a copy of the first subpoena to the email addresses associated with those accounts.[19] Initially, Twitter could not locate email addresses for the two accounts identified in the second subpoena, @boycottbdo2 and @bdoboycott, but sent notice and a copy of the second subpoena to the email addresses for the first two accounts.[20] Later, Twitter found an email address for @boycottbdo2 and sent it the same documents.[21]

---

[17] *Id.* at 460–61.

[18] *Id.* at 460.

[19] *See* Andrade Decl. Ex. 8 (first subpoena); Ex. 10 ("Twitter has sent notice and a copy of your subpoena to any email address(es) associated with any account(s) properly identified in your subpoena.").

[20] *See* Andrade Decl. Ex. 9 (second subpoena); Ex. 18 (Twitter's counsel informing Plaintiff's counsel in an email that "the accounts covered by the second subpoena (@boycottbdo2 & @bdoboycott) have not been notified because they were deleted sufficiently far in advance of Twitter's receipt of the second subpoena that identifying information for those 2 accounts was no longer available in Twitter's regular production tools. . . . notice of the second subpoena was actually sent to the email addresses for the accounts covered by the first subpoena (@boycottbdo & @boycottbdo1).").

[21] *See* Andrade Decl. Ex. 18 (Twitter's counsel informing Plaintiff's counsel in an email that Twitter had "been able to locate some IP addresses for @boycottbdo2 & @bdoboycott, as well as an email address for @boycottbdo2, but not for @bdoboycott. Notice went out to the email address associated with @boycottbdo2").

Defendant argued that notice had not been properly provided because *Cahill* states that "when a case arises in the internet context, the plaintiff must post a message notifying the anonymous defendant of the plaintiff's discovery request on the same message board where the allegedly defamatory statement was originally posted."[22]  Thus, Defendant argued that "BDO was required to inform the anonymous Twitter poster(s) on the Twitter platform of the pending subpoenas."[23]  Satisfying notice in this manner, however, would have proven difficult if not pointless for Plaintiff; with the exception of @boycottbdo, the Twitter Accounts had been deleted.[24]

Even if the accounts had not been deleted, Defendant's argument is unpersuasive. In *Cahill*, the court observed that a federal statute required Comcast to notify the anonymous speaker of the plaintiffs' discovery request but expressed concern that such a statute may not apply to future cases.[25]  Thus, the court held that "regardless of the medium in which the allegedly defamatory statement is published, the plaintiff must undertake *reasonable efforts* to notify the anonymous defendant of the discovery request and must withhold action to allow the defendant an opportunity to respond."[26]

---

[22] *Cahill*, 884 A.2d at 461.

[23] Dkt. 182, Def.'s Opp'n to Pl.'s Mot. for Ct. Authorization for Twitter, Inc. to Comply with Subpoenas ("Answering Br.") at 10–11.

[24] *See* Dkt. 196, Pl.'s Reply in Further Supp. of Its Mot. for Ct. Authorization for Twitter, Inc. to Comply with Subpoenas at 12.

[25] *Cahill*, 884 A.2d at 461.

[26] *Id.* (emphasis added).

Twitter's notice to the email addresses associated with the Twitter Accounts satisfied Plaintiff's reasonable-efforts obligation established in *Cahill*. To hold otherwise would be nonsensical; the entire point of Plaintiff's subpoena is to identify the person responsible for the Twitter Accounts' activity. Twitter has better access to that information than Plaintiff, and @boycottbdo2 is a good example. The @boycottbdo2 account owner deleted the account, and Plaintiff would have therefore wasted its time by attempting to notify @boycottbdo2 of the subpoena by sending a Tweet on the Twitter platform.[27] Twitter was eventually able to locate an email address for @boycottbdo2 and send notice to that address, which is a more reliable method of contacting the anonymous user than posting a Tweet about a subpoena would have been regardless. Plaintiff was not required to duplicate Twitter's efforts on that front; what matters is that the anonymous speaker was notified.

Next, Plaintiff satisfied the summary judgment standard. Summary judgment is granted where there is no genuine issue as to any material fact. A plaintiff who wishes to satisfy the *Cahill* standard must set forth "facts to defeat a summary judgment motion" and "must submit evidence sufficient to establish a prima facie case for each essential element

---

[27] *See also Ciabattoni v. Teamsters Local 326*, 2018 WL 2418388, at *3 (Del. Super. Ct. May 29, 2018) (rejecting the plaintiff's claim "that he is unable to provide notice until he knows the identity of the speaker. Yet the Supreme Court anticipated this conundrum and articulated that 'when a case arises in the internet context, the plaintiff must post a message notifying the anonymous defendant of the plaintiff's discovery request on the same message board where the allegedly defamatory statement was originally posted.' If for some reason Plaintiff would be unable to do so, he must still have made a reasonable effort to notify the speaker. He has not done so here.").

of the claim in question."[28]  In other words, here, BDO had the burden of showing that it would overcome a summary judgment motion on its claims.  BDO asserted that it met the *Cahill* standard for its defamation claim, and I agree.[29]

Under Delaware law, the elements of defamation are "1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory."[30]  Public figures must establish two additional elements to prevail on a defamation claim: "that 5) the statement is false and 6) that the defendant made the statement with actual malice," though the sixth factor is irrelevant to the anonymous speaker revelation standard.[31]

*Cahill* instructs that the first element is the most important because the remaining factors are relatively easy to meet.[32]  Thus, a court must determine "*first*, whether alleged

---

[28] *Cahill*, 884 A.2d at 460.

[29] *See* Mot. at 9.  This letter, much like Defendant's answering brief and oral argument, does not address Plaintiff's arguments that it has also satisfied the *Cahill* standard for its claim under the Deceptive Trade Practices Act.  *See generally* Answering Br.; Oral Arg. Tr.

[30] *Cahill*, 884 A.2d at 463.

[31] *Id.* at 463–64 (clarifying that "we do NOT hold that the public figure defamation plaintiff is required to produce evidence on this element of the claim.  We hold only that a public figure plaintiff must plead the first five elements and offer prima facie proof on each of the five elements to create a genuine issue of material fact requiring trial. In other words, a public figure defamation plaintiff must only plead and prove facts with regard to elements of the claim that are within his control.").

[32] *Id.* at 463.

defamatory statements are expressions of fact or protected expressions of opinion; and [*second*], whether the challenged statements are capable of a defamatory meaning."[33]

To decide whether a statement is one of fact or opinion, the question is whether "the ordinary reader could infer the existence of facts which are capable of being proved true or false."[34] This inquiry is critical because "courts cannot, and should not, evaluate the objective validity of an opinion. To do so violates First Amendment standards."[35] Thus, "political, cultural, and ideological critiques that accuse institutions or individuals of being racist or bigoted are not actionable but are [protected] expressions of name calling and rhetorical hyperbole."[36]

Defendant argues that online media outlets such as chat rooms, Twitter, and Facebook are informal outlets of personal opinion and not reliable sources of information.[37]

Defendant relies on *Cahill*, where the high court reversed the trial court in part based on the platform for the speech—an internet blog expressly dedicated to "opinions" about Smyrna—and concluding that "no reasonable person could have interpreted these statements as being anything other than opinion."[38]

---

[33] *Id.* (citing *Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987)) (emphasis and brackets in original).

[34] *Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *7 (Del. Super. Ct. Apr. 30, 2009).

[35] *Cousins v. Goodier*, 2021 WL 3355471, at *2 (Del. Super. Ct. July 30, 2021).

[36] *Id.* at *4.

[37] Oral Arg. Tr. at 28:15–30:24.

[38] *Cahill*, 884 A.2d at 467.

Defendant also relies on *SunEnergy1, LLC v. Brown*, where the Delaware Superior Court concluded that anonymous reviews on Glassdoor.com are informal outlets of personal opinions and not reliable sources of information. The court in *SunEnergy1* observed that Glassdoor "is a website for employment and company evaluation—it is not a news website (e.g. WSJ.com or NYT.com) where there is an expectation of objective reporting and journalistic standards."[39] Further, Glassdoor was not "a website where a person would go to find detailed factual information about a company such as earnings reports and SEC filings."[40]

Although the court in *SunEnergy1* held that reviews on Glassdoor fell in the opinion column, it noted that "[s]ince the *Cahill* opinion in 2005, the internet has evolved considerably."[41]

That's a dramatic understatement. Social media in the 2020s is a far cry from the blogs, forums, and chatrooms of the mid-2000s. For better or worse, social media platforms like Twitter, which did not even exist in 2005, are being used increasingly as a news source and people expect that at least some of what they encounter on the site is factual. For this proposition, Plaintiff cited a 2019 Pew Research Center study that found 55 percent of U.S. adults often or sometimes rely on social media for their news.[42] That

---

[39] *SunEnergy1, LLC v. Brown*, 2015 WL 7776625, at *4 (Del. Super. Ct. Nov. 30, 2015).

[40] *Id.*

[41] *Id.*

[42] Dkt. 196, Pl.'s Reply in Further Support of its Mot. for Ct. Authorization for Twitter, Inc. to Comply with Subpoenas at 5–6 (citing Elizabeth Grieco and Elisa Shearer,

statistic has remained consistent for Twitter in more recent studies conducted by Pew

Research Center in 2021.[43] Other studies similarly show what is likely unsurprising to any

person walking down the street—that adults often obtain their news from a smartphone,

computer, or tablet.[44]

Even in the absence of such academic research, it is patently obvious that Twitter is

not remotely akin to the small-town blog at issue in *Cahill* or the comparatively limited-

purpose platform of Glassdoor. When billionaires like Elon Musk Tweet, the stock market

moves.[45] The last three White House administrations have distributed official

communications through the President's Twitter account.[46] Because readers rely on social

media platforms for real-time news, those platforms have become battlegrounds for

---

*Americans Are Wary of the Role Social Media Sites Play in Delivering News*, PEW RES. CTR. (Oct. 2, 2019), https://www.pewresearch.org/journalism/2019/10/02/americans-are-wary-of-the-role-social-media-sites-play-in-delivering-the-news/.

[43] *See* Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, PEW RES. CTR. (Sept. 20, 2021), https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

[44] *See* Elisa Shearer, *More than eight-in-ten Americans get news from digital devices*, PEW RES. CTR. (Jan. 12, 2021), https://www.pewresearch.org/fact-tank/2021/01/12/more-than-eight-in-ten-americans-get-news-from-digital-devices/.

[45] *See* Will Davies, *Tesla Shares Slide as Musk Tweets on Lack of Hertz Contract*, BLOOMBERG (Nov. 1, 2021, 11:06 PM, updated Nov. 2, 2021, 4:20 PM), https://www.bloomberg.com/news/articles/2021-11-02/musk-emphasizes-hertz-deal-not-signed-in-tweet-on-tesla-chart.

[46] *See generally* Barbara Ortutay, *@POTUS Resets as Twitter Juggles Presidential Accounts*, U.S. NEWS & WORLD REPORT (Jan. 19, 2021, 7:42 PM), https://www.usnews.com/news/business/articles/2021-01-19/potus-resets-as-twitter-juggles-presidential-accounts.

nefarious actors' information wars.[47]  These information wars have, in turn, resulted in Congress introducing bills to compel platforms to expand their account verification practices.[48]  In today's world, Tweets cannot be categorically pushed into the "opinion" column for *Cahill* purposes.

With the understanding that statements on Twitter can constitute actionable expressions of fact, I turn to the Tweets at issue.  Some fall under the category of opinion, such as those that generally accuse Plaintiff and its CEO of racism.[49]  Others, however, are more concrete, such as those that accuse the CEO of having an affair, sending inappropriate sexual pictures to staffers, and refusing to offer transgendered employees healthcare benefits.[50]  These statements are susceptible of proof; either they occurred, or they did not.  Thus, they are actionable statements of fact, and Plaintiff satisfied the summary judgment

---

[47] *See* Gabby Deutch, *Social Media Has Become a Global Battlefield*, THE ATLANTIC (Oct. 2, 2018), https://www.theatlantic.com/international/archive/2018/10/social-media-battle field-internet/571960/.  *See also* Craig Timberg & Cristiano Lima, *Today's Taliban uses sophisticated social media practices that rarely violate the rules*, THE WASHINGTON POST (Aug. 18, 2021, 9:00 AM), https://www.washingtonpost.com/technology/2021/08/18 /taliban-social-media-success/.

[48] *See* Anita Joseph & Michele Paselli, *Verifying the Identity of People Behind High-Reach Profiles*, META (May 28, 2020), https://about.fb.com/news/2020/05/id-verification-high-reach-profiles/; Social Media Accountability and Account Verification Act, H.R. 6586, 116th Cong. (2020); Social Media Accountability and Account Verification Act, H.R. 4653, 117th Cong. (2021).

[49] *See* Andrade Decl. Ex. 3.

[50] *See* Andrade Decl. Exs. 3, 4, 5.

standard as to the first element of its defamation claim in addition to the remaining elements.[51]

For the above reasons, I granted the Plaintiff's Motion for Court Authorization for Twitter, Inc. to Comply with Subpoenas.

Sincerely,

*/s/ Kathaleen St. Jude McCormick*

Kathaleen St. Jude McCormick
Chancellor

cc:     All counsel of record (by *File & ServeXpress*)

---

[51] It does not matter whether Plaintiff is a public figure on this procedural posture, which would add the fifth element, falsity, as it has denied the truth of the statements time and again.