John DOE No. 1, Movant
Below, Appellant,

v.

Patrick CAHILL and Julia Cahill,
Plaintiffs Below, Appellees.

No. 266, 2005.

Supreme Court of Delaware.

Submitted: Sept. 7, 2005.
Decided: Oct. 5, 2005.

David L. Finger of Finger & Slanina, L.L.C., Wilmington, DE, for appellant.

Robert J. Katzenstein (argued) and Robert K. Beste, III of Smith, Katzenstein & Furlow, L.L.P., Wilmington, DE, for appellees.

Paul Alan Levy (argued) and Allison M. Zieve of Public Citizen Litigation Group, Washington, DC; Norman M. Monhait of Rosenthal Monhait Gross & Goddess, P.A., Wilmington, DE; Lawrence A. Hamermesh of Widener University School of Law, Wilmington, DE, for amici curiae.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice.

The defendant-appellant, John Doe No. 1, anonymously posted allegedly defamatory statements about the plaintiff-appellee, Cahill, on an internet blog. Cahill brought a defamation action. Seeking to serve process on Doe, Cahill sought to compel the disclosure of his identity from a third party that had the information. A Superior Court judge applied a good faith standard to test the plaintiff's complaint and ordered the third party to disclose Doe's identity. Doe appeals from the Superior Court's order. Because the trial judge applied a standard insufficiently protective of Doe's First Amendment right to speak anonymously, we reverse that judgment.

**I.**

On November 2, 2004, the plaintiffs below, Patrick and Julia Cahill, both residents of Smyrna, Delaware, filed suit against four John Doe defendants asserting defamation and invasion of privacy claims. This appeal involves only one of the John Doe defendants, John Doe No. 1 below and "Doe" in this opinion. Using the alias "Proud Citizen," Doe posted two statements on an internet website sponsored by the Delaware State News called the "Smyrna/Clayton Issues Blog"[1] concerning Cahill's performance as a City Councilman of Smyrna. The "Guidelines" at the top of the blog stated "[t]his is your hometown forum for opinions about public issues." The first of Doe's statements, posted on September 18, 2004, said:

If only Councilman Cahill was able to display the same leadership skills, energy and enthusiasm toward the revitalization and growth of the fine town of Smyrna as Mayor Schaeffer has demonstrated! While Mayor Schaeffer has made great strides toward improving the livelihood of Smyrna's citizens, Cahill has devoted all of his energy to being a divisive impediment to any kind of cooperative movement. *Anyone who has spent any amount of time with Cahill would be keenly aware of such character flaws, not to mention an obvious mental deterioration.* Cahill is a prime example of failed leadership—his eventual ousting is exactly what Smyrna needs in order to move forward and establish a community that is able to thrive on its own economic stability and common pride in its town.[2]

The next day, Doe posted another statement:

*Gahill* [sic] *is as paranoid* as everyone in the town thinks he is. The mayor needs support from his citizens and protections from unfounded attacks.... [3]

These were the only two internet postings attributed to Doe or mentioned in the Cahills' complaint.

Pursuant to Superior Court Rule 30, the Cahills sought and obtained leave of the Superior Court to conduct a pre-service deposition of the owner of the internet blog, Independent Newspapers. After obtaining the IP addresses associated with the blog postings from the blog's owner, the Cahills learned that Comcast Corporation owned Doe's IP address. An IP address is an electronic number that specifically identifies a particular computer using the internet. IP addresses are often

---

1. *Available* at http://newsblog. info/0405 (statements at issue are no longer available on the website).

2. Compl. ¶ 7 (emphasis added).

3. *Id. at* ¶ 8 (emphasis added).

owned by internet service providers who then assign them to subscribers when they use the internet. These addresses are unique and assigned to only one ISP subscriber at a time. Thus, if the ISP knows the time and the date that postings were made from a specific IP address, it can determine the identity of its subscriber.

Armed with Doe's IP address, the Cahills obtained a court order requiring Comcast to disclose Doe's identity. As required by Federal Statute[4], when Comcast received the discovery request, it notified Doe. On January 4, 2005, Doe filed an "Emergency Motion for a Protective Order" seeking to prevent the Cahills from obtaining his identity from Comcast. The Superior Court heard argument on the motion on January 7. Following the argument, the trial judge invited supplemental briefing and both Doe and the Cahills submitted additional argument.

On June 14, 2005, the trial judge issued a memorandum opinion denying Doe's motion for a protective order. The Superior Court judge adopted a "good faith" standard for determining when a defamation plaintiff could compel the disclosure of the identity of an anonymous plaintiff. Under the good faith standard, the Superior Court required the Cahills to establish: (1) that they had a legitimate, good faith basis upon which to bring the underlying claim; (2) that the identifying information sought was directly and materially related to their claim; and (3) that the information could not be obtained from any other source. Applying this standard, the Superior Court

held that the Cahills could obtain Doe's identity from Comcast.[5] Doe filed an interlocutory appeal, which we accepted on June 28, 2005.

## II.

■ In this case, Doe claims that the trial judge incorrectly applied a good faith standard when he denied the motion for a protective order. A claim that a trial court applied an incorrect legal standard raises a question of law that we review *de novo*.[6]

## III.

### A.

The internet is a unique democratizing medium unlike anything that has come before. The advent of the internet dramatically changed the nature of public discourse by allowing more and diverse people to engage in public debate. Unlike thirty years ago, when "many citizens [were] barred from meaningful participation in public discourse by financial or status inequalities and a relatively small number of powerful speakers [could] dominate the marketplace of ideas"[7] the internet now allows anyone with a phone line to "become a town crier with a voice that resonates farther than it could from any soapbox."[8] Through the internet, speakers can bypass mainstream media to speak directly to "an audience larger and more diverse than any the Framers could have

---

**4.** 47 U.S.C. 551(c)(2) requires a court order to a cable ISP and notice to the ISP subscriber before an ISP can disclose the identity of its subscriber to a third party.

**5.** Memorandum Opinion, C.A. No. 04C–11–022, 879 A.2d 943, 952–53 (Del.Super.2005).

**6.** *Epstein v. Matsushita Elec. Indus. Co. (In re MCA, Inc. S'holder Litig.)*, 785 A.2d 625, 638

(Del.2001) (citing *Ison v. E.I. Dupont de Nemours & Co.*, 729 A.2d 832, 847 (Del.1999)).

**7.** Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L.J. 855, 896 (2000).

**8.** *Reno v. ACLU*, 521 U.S. 844, 896–97, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

imagined." [9] Moreover, speakers on internet chat rooms and blogs can speak directly to other people with similar interests. A person in Alaska can have a conversation with a person in Japan about beekeeping in Bangladesh, just as easily as several Smyrna residents can have a conversation about Smyrna politics.

Internet speech is often anonymous. "Many participants in cyberspace discussions employ pseudonymous identities, and, even when a speaker chooses to reveal her real name, she may still be anonymous for all practical purposes." [10] For better or worse, then, "the audience must evaluate [a] speaker's ideas based on her words alone." [11] "This unique feature of [the internet] promises to make public debate in cyberspace less hierarchical and discriminatory" than in the real world because it disguises status indicators such as race, class, and age.[12]

■ It is clear that speech over the internet is entitled to First Amendment protection.[13] This protection extends to anonymous internet speech.[14] Anonymous internet speech in blogs or chat rooms in some instances can become the modern equivalent of political pamphleteering. As the United States Supreme Court recently noted, "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and dissent." [15] The United States Supreme Court continued, "[t]he right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse." [16]

■ It also is clear that the First Amendment does not protect defamatory speech. "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances." [17] Certain classes of speech, including defamatory and libelous speech, are entitled to no Constitutional protection. "It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." [18] Accordingly, we must adopt a standard that appropriately balances one person's right to speak anonymously against another person's right to protect his reputation.

9. Lidsky, *supra* note 7, at 895 (citations omitted).

10. *Id.*

11. *Id.* at 896.

12. *Id.*

13. *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (There is "no basis for qualifying the level of First Amendment scrutiny that should be applied to [the internet].").

14. *See, e.g., Doe v. 2TheMart.com Inc.*, 140 F.Supp.2d 1088, 1097 (W.D.Wash.2001) ("[T]he constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded.").

15. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

16. *Id.*

17. *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

18. *Id.*

## III.

## B.

■ In this case, this Court is called upon to adopt a standard for trial courts to apply when faced with a public figure plaintiff's discovery request that seeks to unmask the identity of an anonymous defendant who has posted allegedly defamatory material on the internet. Before this Court is an entire spectrum of "standards" that could be required, ranging (in ascending order) from a good faith basis to assert a claim, to pleading sufficient facts to survive a motion to dismiss, to a showing of *prima facie* evidence sufficient to withstand a motion for summary judgment, and beyond that, hurdles even more stringent. The Cahills urge this Court to adopt the good faith standard applied by the Superior Court. We decline to do so. Instead we hold that a defamation plaintiff must satisfy a "summary judgment" standard before obtaining the identity of an anonymous defendant.

We are concerned that setting the standard too low will chill potential posters from exercising their First Amendment right to speak anonymously. The possibility of losing anonymity in a future lawsuit could intimidate anonymous posters into self-censoring their comments or simply not commenting at all. A defamation plaintiff, particularly a public figure, obtains a very important form of relief by unmasking the identity of his anonymous critics. The revelation of identity of an anonymous speaker "may subject [that speaker] to ostracism for expressing unpopular ideas, invite retaliation from those who oppose her ideas or from those whom she criticizes, or simply give unwanted exposure to her mental processes." [19] Plaintiffs can often initially plead sufficient facts to meet the good faith test applied by the Superior Court, even if the defamation claim is not very strong, or worse, if they do not intend to pursue the defamation action to a final decision. After obtaining the identity of an anonymous critic through the compulsory discovery process, a defamation plaintiff who either loses on the merits or fails to pursue a lawsuit is still free to engage in extra-judicial self-help remedies; more bluntly, the plaintiff can simply seek revenge or retribution.

Indeed, there is reason to believe that many defamation plaintiffs bring suit merely to unmask the identities of anonymous critics. As one commentator has noted, "[t]he sudden surge in John Doe suits stems from the fact that many defamation actions are not really about money." [20] "The goals of this new breed of libel action are largely symbolic, the primary goal being to silence John Doe and others like him." [21] This "sue first, ask questions later" approach, coupled with a standard only minimally protective of the anonymity of defendants, will discourage debate on important issues of public concern as more and more anonymous posters censor their online statements in response to the likelihood of being unmasked.

The parties inform us that we are the first State Supreme Court to address this issue, particularly in the context of a case involving political criticism of a public figure. In the past, this issue has most frequently been presented in cases where publicly traded companies have sued anonymous internet posters for statements that allegedly defamed those companies. In *In re Subpoena to AOL* [22], a Virginia trial

**19.** Lidsky, *supra* note 7 at 890.

**20.** *Id.* at 872.

**21.** *Id.* at 859.

**22.** *In re Subpoena Duces Tecum to America Online, Inc.,* 2000 WL 1210372, 52 Va. Cir. 26, 2000 Va. Cir. Lexis 220 (2000), *rev'd on*

court adopted the good faith standard for determining whether to grant a defamation plaintiff's discovery request seeking to unmask the identity of an anonymous defendant. Indeed, in this very case, the Superior Court derived its standard from the *AOL* opinion. The *AOL* Court held that a trial court should order a non-party ISP to provide information concerning the identity of an anonymous subscriber only (1) when the court is satisfied by the pleadings or the evidence supplied to that court (2) that the party requesting the subpoena had a legitimate, good faith basis to contend that it may be the victim of actionable conduct and (3) the subpoenaed identity information is centrally needed to advance that claim.[23] In our view, this "good faith" standard is too easily satisfied to protect sufficiently a defendant's right to speak anonymously. As one of our recent decisions, *Ramunno v. Cawley,*[24] illustrates, even the more stringent motion to dismiss standard, the middle option in the spectrum of standards from which we may choose, falls short of providing sufficient protection to a defendant's First Amendment right to speak anonymously.

## III.

### C.

■ Long-settled doctrine governs this Court's review of dismissals under

Rule 12(b)(6).[25] Under that doctrine, the threshold for the showing a plaintiff must make to survive a motion to dismiss is low. Delaware is a notice pleading jurisdiction.[26] Thus, for a complaint to survive a motion to dismiss, it need only give "general notice of the claim asserted."[27] A court can dismiss for failure to state a claim on which relief can be granted only if "it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief."[28] On a motion to dismiss, a court's review is limited to the well-pleaded allegations in the complaint.[29] An allegation, "though vague or lacking in detail" can still be well-pleaded so long as it puts the opposing party on notice of the claim brought against it.[30] Finally, in ruling on a motion to dismiss under Rule 12(b)(6), a trial court must draw all reasonable factual inferences in favor of the party opposing the motion.[31]

In *Ramunno,* this Court unanimously reversed the Superior Court's decision to dismiss a plaintiff's libel suit for failure to state a claim based "solely on pleading rules."[32] *Ramunno* was a typical libel case in that the plaintiff, who was not a public figure, knew the defendants' identities. In his complaint, the plaintiff alleged that one defendant made certain false descriptions of the plaintiff's property hold-

*other grounds,* 261 Va. 350, 542 S.E.2d 377 (2001).

23. *Id.* 2000 WL 1210372 at *8.

24. 705 A.2d 1029 (Del.1998)

25. *Ramunno v. Cawley,* 705 A.2d 1029, 1034 (Del.1998).

26. *VLIW Tech., L.L.C. v. Hewlett–Packard Co.,* 840 A.2d 606, 611 (Del.2003).

27. *Ramunno,* 705 A.2d at 1034 (citing *Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 38 (Del.1996)).

28. *Id.* (citing *Spence v. Funk,* 396 A.2d 967, 968 (Del.1978)).

29. *Id.* (citing *In re Santa Fe Pac. Corp. Shareholder Litig.,* 669 A.2d 59, 65 (Del.1995) (citing *In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1993))).

30. *VLIW Tech.,* 840 A.2d at 611.

31. *Ramunno,* 705 A.2d at 1034 (citing *Solomon,* 672 A.2d at 38) (other citations omitted).

32. *Id.* at 1031.

ings in a letter to the Mayor of Wilmington, a copy of which went to *The News Journal*.[33] The Superior Court granted that defendant's motion to dismiss, partly on the grounds that the description in the letter was substantially true.[34] Overturning the trial court, we noted that:

> [w]e [did] not necessarily disagree with the substance of [the trial court's] finding. The trier of fact might very well find that the error was immaterial and that the *controversy itself is **trivial**.* Indeed, on a summary judgment record or at trial, *the defendants may be successful in portraying this dispute as **silly**.*[35]

Nevertheless, we held that the Superior Court had erred in dismissing the complaint because it failed to draw every reasonable factual inference in favor of the plaintiff, as required by existing precedent.[36]

This is not to suggest that the *Ramunno* decision was wrongly decided, for it was not. *Ramunno* clarified how courts of this state must apply the Rule 12(b)(6) standard. We cite *Ramunno* only to illustrate that even silly or trivial libel claims can easily survive a motion to dismiss where the plaintiff pleads facts that put the defendant on notice of his claim, however vague or lacking in detail these allegations may be. Clearly then, if the stricter motion to dismiss standard is incapable of screening silly or trivial defamation suits, then the even less stringent good faith standard is less capable of doing so.

In a case like *Ramunno* where the plaintiff knows the defendant's identity, no constitutional harm comes from allowing a silly or trivial claim to survive a motion to dismiss; the trial court can easily dispose of these cases on a motion for summary judgment. In a case like the one at bar, however, substantial harm may come from allowing a plaintiff to compel the disclosure of an anonymous defendant's identity by simply showing that his complaint can survive a motion to dismiss or that it was filed in good faith. As we intimated in *Ramunno*, a summary judgment proceeding can dispense with weak or even "silly" libel cases before trial (but even then only after significant expense and anxiety to the parties). Applying a summary judgment standard to a public figure defamation plaintiff's discovery request to obtain an anonymous defendant's identity will more appropriately protect against the chilling effect on anonymous First Amendment internet speech that can arise when plaintiffs bring trivial defamation lawsuits primarily to harass or to unmask their critics.

Another court has addressed this issue and reached the same conclusion. In *Dendrite Intl., Inc. v. Doe*[37], an intermediate New Jersey appellate court adopted a standard more stringent than either the motion to dismiss or the good faith standard. *Dendrite* involved a corporate defamation plaintiff seeking to obtain the identity of an anonymous defendant who posted comments about the corporation on an internet message board. The *Dendrite* court held that to decide whether to grant discovery to a plaintiff, a court should carefully review the complaint, and all information provided to the court in addition to the complaint, to determine if the plaintiff has set forth a *prima facie* cause of action against the fictitiously named

---

**33.** *Id.* at 1032.

**34.** *Id.* at 1036.

**35.** *Id.* (emphasis added).

**36.** *Id.*

**37.** 342 N.J.Super. 134, 775 A.2d 756 (App. Div.2001).

anonymous defendants.[38] The court went on to say:

> [i]n addition to establishing that its action can withstand a motion to dismiss for failure to state a claim for which relief can be granted pursuant [to New Jersey court rules], the plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant.[39]

Applying its standard to the facts of the case before it, the *Dendrite* Court held that:

> [a]lthough [the corporation's] defamation claims would survive a traditional motion to dismiss for failure to state a cause of action, we conclude the motion judge appropriately reviewed [the corporation's] claim with a level of scrutiny consistent with the procedures and standards we adopt here today, and therefore the judge properly found [the corporation] should not be permitted to conduct limited discovery aimed at disclosing [Doe's] identity.[40]

We conclude that the summary judgment standard is the appropriate test by which to strike the balance between a defamation plaintiff's right to protect his reputation and a defendant's right to exercise free speech anonymously. We accordingly hold that before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with facts sufficient to defeat a summary judgment motion. We do not, however, specifically adopt the holding in *Den-*

*drite*. As originally set forth, the *Dendrite* test has four parts. It requires a plaintiff:

(1) to undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for an order of disclosure, and to withhold action to afford the anonymous defendant a reasonable opportunity to file and serve opposition to the application. In the internet context, the plaintiff's efforts should include posting a message of notification of the discovery request to the anonymous defendant on the same message board as the original allegedly defamatory posting;

(2) to set forth the exact statements purportedly made by the anonymous poster that the plaintiff alleges constitute defamatory speech; and

(3) to satisfy the *prima facie* or "summary judgment standard." [41]

Finally, after the trial court concludes that the plaintiff has presented a *prima facie* cause of action, the *Dendrite* test requires the trial court to:

(4) balance the defendant's First Amendment right of anonymous free speech against the strength of the *prima facie* case presented and the necessity for the disclosure of the anonymous defendant's identity in determining whether to allow the plaintiff to properly proceed.[42]

■ We retain the notification provision in the *Dendrite* test. Thus, to the extent reasonably practicable under the circumstances, the plaintiff must undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for order of disclosure. The

---

38. *Id.* at 760.

39. *Id.*

40. *Id.* at 771.

41. *Id.* at 760.

42. *Id.* at 760–761.

plaintiff must also withhold action to afford the anonymous defendant a reasonable opportunity to file and serve opposition to the discovery request. Moreover, when a case arises in the internet context, the plaintiff must post a message notifying the anonymous defendant of the plaintiff's discovery request on the same message board where the allegedly defamatory statement was originally posted.

■ The notification provision imposes very little burden on a defamation plaintiff while at the same time giving an anonymous defendant the opportunity to respond. When First Amendment interests are at stake we disfavor *ex parte* discovery requests that afford the plaintiff the important form of relief that comes from unmasking an anonymous defendant. While in this case a Federal Statute required that Comcast notify Doe of Cahill's discovery request, in future cases this type of statute may not exist. Accordingly, regardless of the medium in which the allegedly defamatory statement is published, the plaintiff must undertake reasonable efforts to notify the anonymous defendant of the discovery request and must withhold action to allow the defendant an opportunity to respond.

While the first prong of the *Dendrite* test adds a layer of protection to a defendant's First Amendment right to speak anonymously in addition to the showing required under the summary judgment standard, we do not think that the second and fourth prongs of the *Dendrite* test are necessary. The second requirement, that the plaintiff set forth the exact defamatory statements, is subsumed in the summary judgment inquiry. To satisfy the summary judgment standard a plaintiff will necessarily quote the defamatory state-

ments in his complaint. The fourth *Dendrite* requirement, that the trial court balance the defendant's First Amendment rights against the strength of the plaintiff's *prima facie* case is also unnecessary. The summary judgment test is itself the balance. The fourth requirement adds no protection above and beyond that of the summary judgment test and needlessly complicates the analysis. Accordingly, we adopt a modified *Dendrite* standard consisting only of *Dendrite* requirements one and three: the plaintiff must make reasonable efforts to notify the defendant and must satisfy the summary judgment standard.

### III.

### D.

■ The Cahills argue that the Delaware Constitution gives great weight to the importance of affording remedies to recompense damage to one's reputation and, accordingly, we should adopt a good faith standard for deciding discovery requests to unmask anonymous defendants in defamation cases. We disagree. As we noted recently in *Kanaga v. Gannett Co.*,[43] two sections of the Delaware Bill of Rights are applicable in a case that involves the balancing of the First Amendment right to speak and an individual's right to protect his reputation: Article I, Section 5 and Article I, Section 9. The relevant portion of Section 5 provides:

> The press shall be free to every citizen who undertakes to examine the official conduct of persons acting in a public capacity; and any citizen may freely speak, write and print on any subject, being *responsible* for the *abuse* of that liberty.[44]

---

43. 687 A.2d 173 (Del.1996).

44. DEL. CONST. art. I, § 5., (emphasis added).

Similarly, Section 9, the so-called "remedies" or "open courts" clause, provides in relevant part:

> [a]ll courts shall be open; and every man for an injury done him in his *reputation*, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense.... [45]

In *Kanaga* we interpreted these clauses to establish a "strong state constitutional basis for remedies to recompense damage to one's reputation." [46] Accordingly, "the protection afforded to reputations by the Delaware Constitution weighs heavily in the balance of the analysis involving constitutionally protected speech." [47] Although those provisions of the Delaware Constitution "weigh in the balance" of our analysis in the case at bar, that weight is not conclusive. We are required to weigh against those provisions the fact that this case, unlike *Kanaga*, involves a *public figure* and *political speech*. Moreover and more importantly, as noted above, we must also weigh the fact that allowing a defamation plaintiff to unmask an anonymous defendant's identity through the judicial process is a crucial form of relief that if too easily obtained will chill the exercise of First Amendment rights to free speech. *Kanaga* did not address these important values; it is, therefore, distinguishable.

In *Kanaga* we addressed the issue of when allegedly defamatory speech could qualify as "opinion" and thereby become entitled to protection under the First Amendment. We noted that a statement of opinion "would be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." [48] *Kanaga* offers little, if any, guidance on how to effect a balance between one individual's right to protect his reputation and another's right to engage anonymously in speech protected by the First Amendment. Given those countervailing concerns, we are unable to conclude that the Delaware Constitution's reference to protecting one's reputation strongly supports setting the showing a plaintiff must make to unmask an anonymous defendant at the low thresholds of the good faith or motion to dismiss standards. A summary judgment standard more appropriately balances a defamation plaintiff's right to protect his reputation and a defendant's right to speak anonymously.

### III.

### E.

Although a good faith or motion to dismiss standard sets the bar too low to protect a defendant's First Amendment right to speak anonymously on the internet, a summary judgment standard does not correspondingly set the bar too high for a defamation plaintiff seeking redress for reputational harm to obtain relief. What follows are our reasons for reaching this conclusion.

■ In deciding a motion for summary judgment, "a trial court shall examine the factual record and make reasonable inferences therefrom in the light most favorable to the nonmoving party to determine if there is any dispute of material

---

45. DEL. CONST. art. I, § 9. (emphasis added).

46. *Id.* at 177.

47. *Id.*

48. *Id.* at 179.

fact."[49] "[I]f from the evidence produced there is a reasonable indication that a material fact is in dispute or if it appears desirable to inquire more thoroughly into the facts in order to clarify application of the law, summary judgment is not appropriate."[50] Thus, to obtain discovery of an anonymous defendant's identity under the summary judgment standard, a defamation plaintiff "must submit sufficient evidence to establish a *prima facie* case for each essential element of the claim in question."[51] In other words, the defamation plaintiff, as the party bearing the burden of proof at trial, must introduce evidence creating a genuine issue of material fact for all elements of a defamation claim *within the plaintiff's control.*

Under Delaware law, a public figure defamation plaintiff in a libel case must plead and ultimately prove that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory.[52] In addition, the public figure defamation plaintiff must plead and prove that 5) the statement is false[53] and 6) that the defendant made the statement with actual malice.[54] Finally, "[p]roof of damages proximately caused by a publication deemed libelous need not be shown in order for a defamed plaintiff to recover nominal or compensatory damages."[55]

The first element is perhaps the most important. Whether or not a statement is defamatory is a question of law.[56] In answering this question, Delaware courts must determine: *"first,* whether alleged defamatory statements are expressions of fact or protected expressions of opinion; and [*second*], whether the challenged statements are capable of a defamatory meaning."[57] Because this question is one of law, a judge can just as easily make the determination under a summary judgment standard as under a motion to dismiss standard or a good faith standard. The judge will have before him the allegedly defamatory statements and can determine whether they are defamatory based on the words and the context in which they were published. In short, insofar as the question is one of law, the summary judgment standard imposes no heavier burden than would any other standard with respect to the first element.

The second element of a libel claim requires that the plaintiff show that the allegedly defamatory statement concerns the plaintiff. In most cases, this will be apparent from the face of the statement. In

49. *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428, 444 (Del.2005).

50. *Id.*

51. *Colgain v. Oy–Partek Ab (In re Asbestos Litig.)*, 799 A.2d 1151, 1152 (Del.2002).

52. *Read v. Carpenter*, 1995 WL 945544, *2, 1995 Del.Super. Lexis 251 (Del.Super.1995).

53. *Philadelphia Newspapers v. Hepps.*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

54. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

55. *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978). Doe and the *amici curiae* in this case argue extensively that we should change Delaware libel law to require that a libel plaintiff must plead and prove damages. This is contrary to the settled law of libel. As we noted in *Spence* "[t]he general rule is that any publication which is libelous on its face is actionable without pleading or proof of special damages." We see no reason to change this rule here.

56. *Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987).

57. *Id.*

cases where it is not facially apparent, to satisfy this element the plaintiff can, by affidavit or verified complaint, offer particular facts that establish that the statement refers to him. For example, additional factual averments might be necessary when the allegedly defamatory statement refers to the plaintiff by a nickname.

The plaintiff should also have easy access to proof that the statement was published. He can produce a computer printout of the statements made over the internet or simply direct the court to the specific website where the statements were made should they still be available.

With respect to the fourth element of a libel claim, the plaintiff can present third party affidavits demonstrating a third party's understanding of the statements as defamatory. Similarly, to establish the fifth element of the public figure defamation claim, which requires some proof that the statement is false, the plaintiff can offer his own factually based averment that the statements are false.

■■■ Finally, we are mindful that public figures in a defamation case must prove that the defendant made the statements with actual malice. Without discovery of the defendant's identity, satisfying this element may be difficult, if not impossible. Consequently, we do NOT hold that the public figure defamation plaintiff is required to produce evidence on this element of the claim. We hold only that a public figure plaintiff must plead the first five elements and offer *prima facie* proof on each of the five elements to create a genuine issue of material fact requiring trial. In other words, a public figure defamation plaintiff must only plead and prove facts with regard to elements of the claim that are within his control.

Given that the plaintiff will have easy access to proof of five of the six elements of a defamation claim, it is not overly burdensome to require the plaintiff to submit a verified complaint or affidavits to substantiate that claim. In short, under the summary judgment standard, scrutiny is likely to reveal a silly or trivial claim, but a plaintiff with a legitimate claim should be able to obtain the identity of an anonymous defendant and proceed with his lawsuit. Delaware trial judges will then still provide a potentially wronged plaintiff with an adequate means of protecting his reputation thereby assuring that our courts remain open to afford redress of injury to reputation caused by the person responsible for abuse of the right to free speech.[58]

Besides the legal remedies available to a plaintiff wronged by internet defamation, the potential plaintiff has available a very powerful form of extrajudicial relief. The internet provides a means of communication where a person wronged by statements of an anonymous poster can respond instantly, can respond to the allegedly defamatory statements on the same site or blog, and thus, can, almost contemporaneously, respond to the same audience that initially read the allegedly defamatory statements. The plaintiff can thereby easily correct any misstatements or falsehoods, respond to character attacks, and generally set the record straight. This unique feature of internet communications allows a potential plaintiff ready access to mitigate the harm, if any, he has suffered to his reputation as a result of an anonymous defendant's allegedly defamatory statements made on an internet blog or in a chat room.[59]

---

58. *See* DEL. CONST. art. I, § 5, 9.

59. Indeed, in this case, it appears that Cahill responded to some of his critics on the same internet blog.

## III.

### F.

In adopting the summary judgment standard to govern situations where a defamation plaintiff seeks to obtain the identity of an anonymous defendant, we do not rely on the nature of the internet as a basis to justify our application of the legal standard. That is, we make no distinction between communications made on the internet and those made through other traditional forms of media in determining the standard to be applied. Thus, whenever a defamation plaintiff seeks to unmask an anonymous defendant, we apply the summary judgment standard regardless of the chosen medium of publication. While as a form of communication the internet is not legally distinct and warrants no special protection above and beyond what traditional forms of communication receive, it is worth noting that certain factual and contextual issues relevant to chat rooms and blogs are particularly important in analyzing the defamation claim itself.

Ranked in terms of reliability, there is a spectrum of sources on the internet. For example, chat rooms and blogs are generally not as reliable as the *Wall Street Journal Online*.[60] Blogs and chat rooms tend to be vehicles for the expression of opinions; by their very nature, they are not a source of facts or data upon which a reasonable person would rely. At least three courts have recently made this observation. Addressing the issue as it related to statements made in a chat room about the performance of a specific publicly traded company, the Court in *Rocker Mgmt., LLC v. John Does 1 through 20*,[61] noted that the messages tended to be "replete with grammar and spelling errors; most posters do not even use capital letters. Many of the messages are vulgar and offensive, and are filled with hyperbole." The court continued, "in this context, readers are unlikely to view messages posted anonymously as assertions of fact."[62]

Another federal court has similarly noted, "[u]nlike...traditional media, there are no controls on the postings. Literally anyone who has access to the internet has access to the chatrooms."[63] Moreover, "the statements were posted in the general cacophony of an internet chat-room in which about 1,000 messages a week are posted...."[64] "Importantly, the postings are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents....To put it mildly, these postings...lack the formality and polish typically found in documents in which a reader would expect to find fact."[65] The court concluded that the general tone, context, style and content of the postings "strongly suggest that they are the opinions of the posters."[66] Accordingly, the "reasonable reader, looking at the hundreds and thousands of postings about the company from a wide variety of posters, would not expect that [the defendant] was airing anything other than his personal views...."[67]

---

60. *Available* at http://online.wsj. com/public/us.

61. 2003 WL 22149380, at *2, 2003 U.S. Dist. Lexis 16277, *5 (N.D.Cal.2003).

62. *Id.*

63. *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F.Supp.2d 1261, 1264 (C.D.Cal.2001).

64. *Id.* at 1267.

65. *Id.*

66. *Id.*

67. *Id.* at 1268.

In *SPX Corp v. Doe* [68] the court granted a defendant's motion to dismiss a defamation claim. In so doing the court analyzed four factors: "(1) the specific language used; (2) whether the statement is verifiable; (3) the written context of the statement; and (4) the broader social context in which the statement is made." [69] In addressing the fourth factor, the court noted:

> Statements appearing in such locations as forum and commentary newspaper sections, or other venues often associated with "cajoling, invective, and hyperbole", are more likely opinion.... Here, the Defendant's statements were posted on an Internet message board. Such message boards are accessible to anyone of the tens of millions of people in this country (and more abroad) with Internet access, and no one exerts control over the content. Pseudonym screen names are the norm. A reasonable reader would not view the blanket, unexplained statements at issue as "facts" when placed on such an open and uncontrolled forum. Indeed, Yahoo! places a disclaimer which appears on the copies of the postings submitted with the Complaint:

> **Reminder.** This board is not connected with the company. These messages are only the opinion of the poster... [70]

Apart from the editorial page, a reasonable person reading a newspaper in print or online, for example, can assume that the statements are factually based and researched. This is not the case when the statements are made on blogs or in chat rooms. "When one views...allegedly defamatory statements in context—both the immediate context and the broader social context—it becomes apparent that many of the allegedly defamatory statements cannot be interpreted as stating actual facts, but instead are either 'subjective speculation' or 'merely rhetorical hyperbole.'" [71]

## III.

### G.

■ Having adopted a summary judgment standard, we now apply it to the facts of this case. Normally an appellate court does not decide summary judgment motions in the first instance. A trial judge's decision to grant or reject summary judgment, however, is a matter of law [72] that we review *de novo*. [73] Accordingly, because we are deciding only a legal question on the same paper record, and given the social interest in the prompt resolution of this dispute, we decide the issue without remanding this case to the trial court.

■ In deciding whether or not a statement is defamatory we determine, *"first,* whether alleged defamatory statements are expressions of fact or protected expressions of opinion; and *[second]*, whether the challenged statements are capable of a defamatory meaning." [74] In this case, Doe made two potentially defamatory statements:

1) Anyone who has spent any amount of time with Cahill would be keenly aware of ... [his]character flaws, not to mention an obvious mental deterioration;

---

68. 253 F.Supp.2d 974 (N.D.Ohio 2003).

69. *Id.* at 980.

70. *Id.* at 981 (citations omitted).

71. Lidsky, *supra* note 7 at 939 (citations omitted).

72. Del.Super. Ct. Civ. R. 56(c).

73. *Plummer v. Sherman,* 861 A.2d 1238, 1242 (Del.2004).

74. *Riley,* 529 A.2d at 251.

2) Gahill [sic] is . . . paranoid.

Applying a good faith standard, the trial judge concluded, "it is enough to meet the 'good faith' standard that the Cahills articulate a legitimate basis for claiming defamation in the context of their particular circumstances."[75] He continued "[g]iven that Mr. Cahill is a married man, [Doe's] statement referring to him as "Gahill" might reasonably be interpreted as indicating that Mr. Cahill has engaged in an extra-marital same-sex affair. Such a statement may form the basis of an actionable defamation claim."[76] We disagree. Using a "G" instead of a "C" as the first letter of Cahill's name is just as likely to be a typographical error as an intended misguided insult. Under the summary judgment standard, no reasonable person would interpret this statement to indicate that Cahill had an extra-marital same-sex affair. With respect to Doe's other statements, the trial judge noted:

> Again, the context in which the statements were made is probative. [Doe's] statements might give the reader the impression that [Doe] has personal knowledge that Mr. Cahill's mental condition is deteriorating and that he is becoming "paranoid." Given that Mr. Cahill is a member of the Smyrna Town Council, an elected position of public trust, the impression that he is suffering from diminished mental capacity might be deemed capable of causing harm to his reputation, particularly when disseminated over the internet for all of his constituents to read.[77]

We agree that the context in which the statements were made is probative, but reach the opposite conclusion. Given the context, no reasonable person could have interpreted these statements as being anything other than opinion. The guidelines at the top of the blog specifically state that the forum is dedicated to *opinions* about issues in Smyrna. If more evidence of that were needed, another contribution to the blog responded to Doe's second posting as follows: "Proud Citizen, you asked for support, I don't think you are going to get it here. Just by reading both sides, your tone and choice of words is [that of] a type of person that couldn't convince me. You sound like the person with all the anger and hate . . . "

■ At least one reader of the blog quickly reached the conclusion that Doe's comments were no more than unfounded and unconvincing opinion. Given the context of the statement and the normally (and inherently) unreliable nature of assertions posted in chat rooms and on blogs, this is the only supportable conclusion. Read in the context of an internet blog, these statements did not imply any assertions of underlying objective facts. Accordingly, we hold that as a matter of law a reasonable person would not interpret Doe's statements as stating facts about Cahill. The statements are, therefore, incapable of a defamatory meaning. Because Cahill has failed to plead an essential element of his claim, he *ipso facto* cannot produce *prima facie* proof of that first element of a libel claim, and thus, cannot satisfy the summary judgment standard we announce today. Doe's statements simply are not sufficient to give rise to a *prima facie* case for defamation liability.[78]

---

**75.** Memorandum Opinion, C.A. No. 04C-11-022, 879 A.2d at 954 (Del.Super.2005).

**76.** *Id.*

**77.** *Id.* at 954

**78.** We do not hold as a matter of law that statements made on a blog or in a chat room can never be defamatory. We hold only that in order to recover, a plaintiff having a defamation claim based on a statement made in an internet chat room or on a blog must

## IV.

For these reasons, we **REVERSE** the judgment of the Superior Court and **RE-MAND** the case to the Superior Court with instructions to **DISMISS** the plaintiff's claim with prejudice.

prove that a statement is factually based and thus capable of a defamatory meaning. *See Kanaga,* 687 A.2d at 179 ("[A] statement of opinion would be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.")