## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALLERGY RESEARCH GROUP, LLC. | ) ) ) | |
| Plaintiff-Counterclaim Defendant, | ) ) ) | |
| v. | ) ) | C.A. No.: N21C-10-073 FJJ |
| NUTRITIONAL THERAPEUTICS, INC. and JOHN CASEY, | ) ) ) | |
| Defendants-Counterclaim Plaintiffs. | ) ) | |

Submitted: April 22, 2022
Decided: April 25, 2022

**OPINION AND ORDER ON ALLERGY RESEARCH GROUP, LLC'S MOTION TO DISMISS AND MOTION TO STAY DISCOVERY AND NUTRITIONAL THERAPEUTICS, INC. and JOHN CASEY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

*David Holmes, Esquire and Christopher Page, Esquire*, Cross & Simon LLC, Wilmington, Delaware, Attorneys for Plaintiff.

*Scott Czerwonka, Esquire*, Wilks Law, LLC, Wilmington, Delaware, Attorney for Defendant

**Jones, J.**

Allergy Research Group, LLC ("ARG" or "Plaintiff"), has filed a complaint against Nutritional Therapeutics, Inc. ("NTI") and John Casey ("Casey") (collectively "Defendants"), alleging that the Defendants have defaulted on a note and that Casey was responsible for that default because he signed a guaranty. In response to this Complaint, Defendants have filed an Answer and a Counterclaim ("SAC"). In its Counterclaim, Defendants allege they were fraudulently induced to enter into the note and guaranty. Defendants request Declaratory Relief, seek specific performance under a stock purchase agreement, and allege a breach of contract. ARG has moved for Partial Dismissal of the Counterclaims. ARG has also moved to stay discovery pending decision on the Motion to Dismiss. Defendants have moved for partial summary judgment as to Count V of the Counterclaim. This is the Court's decision on these motions.

## STANDARD OF REVIEW

Under Superior Court Civil Rule 12(b)(6), the legal issue to be decided is whether a plaintiff can recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.[1] If any reasonable conception can be formulated to allow Plaintiffs' recovery, the motion must be denied.[2] The Court must accept as true well-pleaded allegations for Rule 12(b)(6)

---

[1] *Vinton v. Grayson,* 189 A.3d 695, 700 (Del. Super. 2018).
[2] *Id.* (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC,* 27 A.3d 531, 535 (Del. 2011)).

purposes.[3] All reasonable factual inferences will be drawn in the non-moving party's favor.[4] If the claimant may recover under that standard, then the Court must deny the motion to dismiss.[5] This is because "[d]ismissal is warranted [only] where the plaintiff has failed to plead facts supporting an element of the claim or, that under no reasonable interpretation of the facts alleged, could the complaint state a claim for which relief might be granted."[6]

Under Superior Court Civil Rule 9(b),[7] fraud must be pled with particularity.[8] In order to satisfy Rule 9(b), a party must allege with particularity the : (i) time, place, and contents of the false representations: (ii) the identity of the person[9] making the false statements; and (iii) the benefit to be obtained by making them. Essentially, the Counterclaim Plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis of the claim.[10]

## FACTS

The facts are drawn from the Defendants' Counterclaim as this Court must accept all well-pleaded factual allegations as true.

---

[3] *Anderson v. Tingle*, 2011 WL 3654531, at *2 (Del. Super. Ct. Ct. August 15, 2011).
[4] *Wilmington Sav. Fund Soc'y, F.S.B. v. Anderson*, 2009 WL 597268, at *2 (Del. Super. Ct. Mar. 9, 2009) (citing *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005)).
[5] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).
[6] *Hendenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. August 20, 2004).
[7] Super. Ct. Civ. R. 9(b).
[8] *Trentwick American Litigation Trust v. Ernest & Young, LLC.*, 906 A.2d 168, 207 (Del.Ch. 2006), *aff'd* 931 A.2d 438 (Del. 2007).
[9] *Nutt v. AC&S, Inc.*, 466 A.2d 18 (Del. Super. Ct. 1983), *aff'd sub. nom., Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647 (Del. 1984).
[10] *CRE Niagra Holdings, LLC v. Resorts GRP, Inc.*, 2021 WL 1292792 (Del. Super. Ct. 2021).

On or around January 22, 2014, ARG entered into a Stock Purchase Agreement with NTI and its stockholders, whereby ARG agreed to acquire all of the issued and outstanding common shares of NTI (the "SPA"). Pursuant to the terms of the SPA, the purchase of shares was to take place in phases. Fifty-one (51) percent of the shares were purchased by ARG on the Initial Closing Date. An additional ten (10) percent of the shares were issued upon the conversion of various convertible loans issued to Casey and the Company in connection with the SPA. The Final Share Purchase of all remaining shares was scheduled to take place on around July 27, 2017, as long as certain conditions were met. One of those conditions was that the parties were to obtain an independent business valuation in order to determine the fair purchase price of the remaining shares.

Pursuant to the SPA, ARG's President, Manfred Salomon ("Salomon") was appointed as President of NTI and Casey was appointed as NTI's Chief Operating Officer.

In late 2014, the parties discussed NTI's plan to introduce a new product line, However, NTI needed funds to cover the purchase of inventory and to hire new labor. ARG committed to providing the necessary funds as an investment. On April 30, 2015, ARG provided $300,000 to NTI to support the new product launch. This investment was not memorialized in any contemporaneous written agreement or document. Given the anticipated closing under the SPA pursuant to which ARG

4

would complete its acquisition of NTI, the parties agreed that these funds were an investment with ARG never requesting repayment until negotiating the transactions described below. With control over NTI's books and operations leading up to the anticipated closing under the SPA, ARG manipulated NTI's books and listed this investment as a liability. This action was taken unbeknownst to Casey or any independent officer or director of NTI.

On or around January 26, 2016, ARG loaned NTI $80,000 to support working capital and firm up NTI's balance sheet. NTI has since repaid the $80,000 to ARG.

The final closing was contractually required to occur by July 27, 2017. ARG began pushing for the closing to occur without an independent business valuation. NTI insisted that the parties comply with the SPA, and eventually, the parties agreed to engage The Mentor Group to conduct a valuation. The Mentor Group eventually valued the Company at $7,657,000. Based on ARG's contractual obligation to purchase the remaining 39% of NTI shares, the final purchase price of the remaining shares of NTI was $2,986,230. The parties agreed that it would not be appropriate to apply the control and marketability discounts suggested by The Mentor Group.

With the valuation completed by The Mentor Group, NTI pressed for the closing to take place under the SPA. ARG refused to close on its purchase of the remaining shares of NTI.

After ARG refused to comply with their contractual obligations to close on the purchase of shares of NTI based on The Mentor Group valuation, the parties discussed an agreement whereby NTI would relieve ARG of their contractual obligations to pay approximately $3 million to complete the transaction under the SPA. In exchange for releasing ARG from its contractual obligation to close, NTI would buyback ARG's shares for nominal value. NTI enlisted the assistance of Jerry Silver, a long-time consultant for NTI.

During the early months of 2020, the parties did not make much progress on the negotiations of a potential buyback. During this same period, Casey was suffering from severe health problems which resulted in his hospitalization.

Casey's health further deteriorated and he was scheduled for an organ transplant in June of 2020. Salomon and ARG were well-aware of Casey's health condition. While the transplant was scheduled for late June, Casey was told to be ready as a transplant candidate because an organ could become available at any time. Despite knowing of Casey's serious health condition, in late May of 2020, ARG pressed to finalize the transaction.

In connection with negotiating the buyback transaction, ARG demanded that the Defendants execute the Second Amended Note and the Guaranty. In addition, the parties executed an Agreement to Terminate Obligations Under the SPA. ARG included the following clauses in the Agreement to Terminate:

6

WHEREAS, subsequent to the execution of the Purchase Agreement, Purchaser loaned the Company $300,000 in working capital pursuant to a promissory note dated February 23, 2015, with a maturity date of February 22, 2016 bearing interest rate of .40% per annum, and on January 27, 2016 loan an additional $80,000 the Company; and

WHEREAS, the loans were combined into an amended and restated promissory note dated March 17, 2016 to extend the maturity date to December 31, 2016, to increase the principle amount of the note to $381,520,00 and to increase the interest rate to the then APR of .65% per annum (the "Amended and Restated Note") ….

This Agreement to Terminate also noted that the Amended and Restated Note would be refinanced and a new note executed along with a personal guarantee.

On behalf of NTI, Silver asked ARG's legal counsel for copies of the original note and the Amended and Restated Note. On June 2, 2020, ARG's counsel (Gretchen Cowen) responded via email and told Silver "I do not have a signed copy of [the Amended and Restated Note] nor was I able to located [sic] a signed copy of the 2015 note although I am pretty sure Laura has the signed copy on that one." Casey had several telephone conversations with Salomon in the last few days of May and the first couple days of June. During those telephone conversations, Casey asked Salomon to send copies of the original note and the Amended and Restated Note. Salomon repeatedly represented to Casey that these previous notes existed and promised to send them after the documents were executed. However, Salomon insisted that the documents be executed immediately because there was an

7

impending change in management, he would be leaving ARG, and the transaction was in jeopardy if the documents were not signed immediately.

In justifiable reliance on Salomon's false representations that the previous promissory notes existed and would be provided to NTI after closing, and that Salomon was imminently leaving ARG and the documents had to be signed immediately, Casey (on behalf of NTI, himself and as Sellers' Representative) was induced to execute (i) the Second Amended Note and Guarantee, and (ii) an Agreement to Terminate Obligations under the SPA, which released ARG of its contractual obligations to purchase the remaining shares of NTI. Casey also executed these documents under duress and coercion because of his serious medical condition.

Salomon continued as President of ARG well after May 31, 2020.

NTI continued to fulfill purchase orders made by ARG. Under the terms of the purchase order, payment is due within 30 days of the delivery of the product. As of January 6, 2022, ARG owes $108,488.52 related to fulfilled purchase orders, which are now past due.

## MOTION TO DISMISS COUNT IV

Count IV of the Counterclaim seeks specific performance of the parties Stock Purchase Agreement. As this is an equitable claim, ARG has moved to dismiss this claim on the basis that this Court does not have jurisdiction. ARG is correct that this

8

Court lacks jurisdiction for a claim for specific performance.[11] Defendant's claim for specific performance is DISMISSED without prejudice.[12]

## MOTION TO DISMISS COUNTS I - III

Counts I – III of the Counterclaim are premised on fraudulent inducement. To state a claim for fraudulent inducement, one must allege:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[13]

As a preliminary matter, ARG claims that Defendants failed to comply with 10 *Del.C.* §3901(d) because an Amended Affidavit of Defense was not filed. The record shows that an Amended Affidavit was filed on February 10, 2022.[14] Therefore this argument is without merit.

ARG maintains that Defendants have not sufficiently pled their fraudulent inducement claim and, as a result, it should be dismissed. This Court disagrees. The

---

[11] *Mills v. Gosling Creek, Inc.,* 1993 WL 485901 (Del. Super. Ct. 1993).

[12] Defendant's claim that this Court should not be dismissed because the parties were working on how to proceed on this issue – this is not a valid reason to avoid a clear jurisdictional issue. The Defendants are free to seek designation or transfer but at this point this Court lacks jurisdiction over this claim. In fact, Defendants in their paperwork have asked this Court to seek designation in order for this Judge to handle the claim for specific performance.

[13] *Sofregen Med. Inc. v. Allergan Sales, LLC,* 2021 WL 14000071, at *2 (Del. Super. Ct. April 1, 2021). *ITW Global Investments, Inc. v. American Industrial Partners Capital Fund, VI LP,* 2015 WL 3970908 (Del. Super. Ct. 2015).

[14] *See* Docket Entry 9, transaction 67299918.

verified Answer and Counterclaim adequately plead with the required specificity the elements of fraudulent inducement.

First, the SAC sets forth the details regarding the false representations of fact made by ARG.[15] In connection with entering into the Second Amended Note and Guarantee, and the Agreement to Terminate Contractual Obligations under the SPA, ARG falsely represented to Defendants the existence of an original note and an amended note.[16] Defendants also specifically allege that both before and after the June 2 email, Casey asked Salomon to send copies of the original note and the Amended and Restated Note.[17] Defendants further alleged that Salomon repeatedly represented to Casey that these previous notes existed and promised to send them after the documents were executed.[18] In addition, ARG falsely represented that Salomon was immediately leaving ARG and the documents needed to be signed immediately.[19]

Second, Defendants have pled that ARG knew the representations were false or made with reckless indifference to the truth.[20] Specifically, Defendants allege that ARG, through Salomon, repeatedly assured Defendants that the previous notes would be produced, "despite knowing that the previous notes do not exist or were

---

[15] SAC ¶¶ 19-22, 35.
[16] *Id.* at ¶¶ 19-22, 35.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at ¶¶ 20-21, 36.

10

fraudulently executed."[21] Moreover, Defendants specifically allege that Salomon "knew the representation that he would be leaving ARG was false, as he continued to serve as president of ARG well after" the negotiations. *Id.* ¶ 21.

Third, Defendants have pled that ARG made the aforementioned false representations to induce Defendants to execute the Second Amended Note and Guaranty and induce Defendants to execute the Agreement to Terminate Obligations under the SPA, which they did in justifiable reliance on the false representations.[22] Defendants specifically allege that "[i]n justifiable reliance" of ARG's false representations, Defendants were "induced to execute" the disputed documents.[23]

Fourth, defendants specifically allege that they were injured by their reliance on ARG's false representations, which included paying $188,000 under the fraudulent Second Amended Note.[24]

Defendants have alleged the circumstances of fraud with detail sufficient to apprise ARG of the basis of the claim. Defendants have pled the time, place and contents of the false representation. Defendants have also plead the identity of the person making the false representation and what the person intended to gain by

---

[21] *Id.* at ¶ 21.
[22] *Id.* at ¶¶ 22, 37.
[23] *Id.* ¶ 22. "The question of whether one's reliance was reasonable generally is a question of fact…. The reasonableness of one's reliance on false information depends on all of the circumstances. As such, whether a party's reliance was reasonable is not generally suitable for resolution on a motion to dismiss." *TrueBlue Inc. v. Leeds Equity Partners IV, LP,* 2015 WL 5967826, at *7 (Del. Super. Ct., Sept. 25, 2015).
[24] *Id.* at ¶ 38.

making the representation. Defendants have more than satisfied the particularity requirement of Rule 9(b). Therefore, Plaintiff's Motion to Dismiss is **DENIED**.

## MOTION TO STAY DISCOVERY

Plaintiffs have moved to stay discovery pending resolution of its Motion to Dismiss. Having denied Plaintiff's Motion to Dismiss, the Motion to Stay Discovery is now moot. Discovery may commence.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment on Count V of Defendants' SAC. Count V of Defendants' SAC is a breach of contract claim. Defendants allege that the Counterclaim Defendant (Plaintiff) placed purchase orders with Defendants and that the orders were fulfilled by Defendants and accepted without any complaints and invoiced by the Counterclaim Defendant (Plaintiff). The net amount of the invoices is $108,488.52 and remains unpaid and overdue. Defendants have submitted the affidavit of Ellen Hoil verifying these facts.

Under Superior Court Civil Rule 56, a party is entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[25] A material issue of fact exists if "a rational finder of fact could find some material fact that would favor the nonmoving party in a

---

[25] Super. Ct. Civ. R. 56(c).

12

determining way[.]"[26] The factual record on a summary judgment motion must be viewed in the light most favorable to the non-moving party.[27]

The initial burden is on the moving party to demonstrate that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.[28] If the moving party meets the initial burden, the burden shifts to the non-moving party to show that a genuine issue of material fact exists.[29] "It is not enough for the opposing party merely to assert the existence of such a disputed issue of fact… [i]f the facts permit reasonable persons to draw from them but one inference, the question is ripe for summary judgment."[30] Where a moving party submits an affidavit in support of a motion for summary judgement, the opposing party must submit a countervailing affidavit or other evidence, or the moving party's affidavit will be presumed to be true.[31]

In response to the Motion for Summary Judgment, ARG maintains that the motion is premature and discovery is needed. An affidavit of Corona Cox, the Director of Finance and Accounting of ARG, has been filed in support of this position. In the affidavit, Ms. Cox lays out what discovery is needed to determine the accuracy of Defendants' Count V in its counterclaim which is based on the

---

[26] *Deloitte LLP v. Flanagan,* 2009 WL 5200657 at *3 (Del. Ch. Dec. 29, 2009).
[27] *Gruwell v. Allstate Ins. Co.,* 988 A.2d 945, 947 (Del. Super. Ct. 2009).
[28] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[29] *Id.* (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).
[30] *Id.* (citing *Wootten v. Kiger*, 226 A.2d 238, 239 (Del. 1967)).
[31] *Highline Financial Services, Inc., v. Rooney*, 1996 WL 663100, at *1 (Del. Super. Ct. 1996).

invoices.  I will treat this affidavit as an affidavit under Superior Court Rule 56(f).  As such I am refusing the application for summary judgment at this time without prejudice.  I will permit ARG to engage in the discovery outlined in Ms. Cox's affidavit.  At the conclusion of discovery the Court will entertain another motion on this point if the Defendants determine to refile it.

IT IS SO ORDERED this 25th day of April, 2022.


_/s/ Francis J. Jones, Jr._

Francis J. Jones, Jr., Esquire


/jb
File & Serve Xpress